# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2015         Decided August 25, 2015

No. 13-5335

CAUSE OF ACTION,
APPELLANT

v.

FEDERAL TRADE COMMISSION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00850)

———

*Aram A. Gavoor* argued the cause for appellant. With him on the briefs were *Patrick J. Massari*, *Allan L. Blutstein*, *R. James Valvo III*, and *Marie Allison Connelly*. *Daniel Z. Epstein* and *Reed D. Rubinstein* entered appearances.

*Katie Townsend* argued the cause for *amici curiae* Reporters Committee for Freedom of the Press, et al. On the brief were *Bruce D. Brown*, *Gregg P. Leslie*, *Peter E. Scheer*, and *Greg Lewis*.

*Victoria Toensing*, *Joseph E. diGenova*, and *Brady Toensing* were on the brief for *amicus curiae* The Daily Caller News Foundation in support of appellant.

*Peter R. Maier*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *R. Craig Lawrence* and *Alan Burch*, Assistant U.S. Attorneys. *Mitchell P. Zeff*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, BROWN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Cause of Action ("Action"), a nonprofit organization, filed a series of three Freedom of Information Act (FOIA) requests with the Federal Trade Commission. The question presented is who should pay the costs of satisfying those requests. Action contends that FOIA entitles it to a complete waiver of the customary fees because "disclosure of the information is in the public interest," 5 U.S.C. § 552(a)(4)(A)(iii). In the alternative, Action contends that it is entitled to a waiver of all but duplication costs because it is "a representative of the news media," *id.* § 552(a)(4)(A)(ii)(II).

The Commission and the district court rejected Action's claims for fee waivers regarding its first and second FOIA requests, and then concluded that Action's claims regarding its third request were moot. We conclude that Action's claims regarding its third request were not moot, and that the case must be remanded for reconsideration in light of the entire administrative record and our clarification of the standards for FOIA fee waivers.

I

FOIA permits an agency to exact a reasonable charge for "document search, duplication, and review, when records are

requested for commercial use." 5 U.S.C. § 552(a)(4)(A)(ii)(I). Certain categories of requests and requesters, however, are entitled to more favorable treatment. Two such categories are at issue in this case. First, an agency must furnish records without any charge or at a reduced charge "if disclosure of the information is in the *public interest* because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii) (emphasis added). Second, an agency may charge only for duplication costs "when records are not sought for commercial use and the request is made by . . . a *representative of the news media.*" *Id.* § 552(a)(4)(A)(ii)(II) (emphasis added). Action asked the Federal Trade Commission (FTC) for fee waivers under both categories.

## A

Action is a nonprofit organization that "advocates for economic freedom and opportunity by educating the public about the threat posed by improvident federal regulations, spending, and cronyism." Action Br. 6. It began operations on August 15, 2011. Two weeks later, Action submitted its first FOIA request to the FTC, seeking all records relating to the Commission's guides for the use of product endorsements in advertising. The request covered, inter alia, records relating to the drafting of the guides and to investigations of alleged violations of the guides. Action later agreed to limit its request to records relating to "changes to the Guides concerning social media authors," FTC Letter of 9/22/2011 (App. 24), and said that it was interested in using the requested information to inform the public about a threat to the First Amendment rights of such authors. Action also asserted that, as a nonprofit educational organization with no commercial purpose, it was entitled to a public-interest fee waiver.

The FTC denied Action's public-interest waiver application, stating that the statute provides for such a waiver only if disclosure is "'likely to contribute significantly to public understanding of the operations or activities of the government.'" FTC Letter of 9/22/2011 (App. 25) (quoting 5 U.S.C. § 552(a)(4)(A)(iii)). Action responded by asserting that disclosure of the records was in fact likely to make such a contribution. Action also asserted, in the alternative, that it was entitled to a fee waiver as a representative of the news media. Action Letter of 9/26/2011 at 1 (App. 26) (citing 5 U.S.C. § 552(a)(4)(A)(ii)(II)). In reply, the FTC said that Action was not entitled to either form of relief because, inter alia, "you have not demonstrated your ability [to] disseminate information." FTC Letter of 10/7/2011 (App. 28). Pursuant to its rules for "general public" requesters, the Commission provided Action with 100 pages of records free of charge. *See* 16 C.F.R. § 4.8(b)(3); *see also* 5 U.S.C. § 552(a)(4)(A)(iv)(II). It retained the additional responsive pages pending receipt of payment from Action. Action then filed an administrative appeal within the agency, which the agency denied, reiterating that "you have failed to provide adequate information about your dissemination plans." FTC Letter of 11/29/2011 at 1 (App. 35).

In tandem with the administrative appeal of its fee-waiver applications regarding its first request, Action made a second FOIA request, this time for all records concerning prior cases in which the FTC granted public-interest fee waivers and the process by which the Commission made those determinations. Action applied for public-interest and news-media fee waivers for this second request as well. Once again, the FTC denied the fee-waiver applications, designated Action as a "general public" requester, provided it with 100 pages without charge, and retained the remaining responsive pages pending payment. The Commission also withheld portions of eight documents under various statutory exemptions to FOIA. Action again filed an

administrative appeal of the denial of its applications for fee waivers, which the FTC again denied, stating that Action had "failed to provide any meaningful level of detail regarding [its] dissemination efforts or ability," FTC Letter of 2/27/2012 at 1 (App. 161), and failed to provide "sufficient information to establish [its] status as a news media representative," *id.* at 3.

On January 27, 2012, Action made its third and final FOIA request. This request "perfected," repeated, and expanded the subject matter of Action's earlier requests. Action Letter of 1/27/2012 at 8 (App. 159). It also made an entirely new request: for all records relating to the process by which the FTC had determined that Action, in particular, was not entitled to a fee waiver for its earlier requests. The FTC disregarded the part of Action's submission that merely renewed its prior requests on the ground that it was a "duplicate" of those requests. FTC Letter of 3/19/2012 at 1 n.1 (App. 174). The Commission identified 95 pages of records responsive to the other parts. It withheld 16 of those pages under a FOIA exemption and released the remaining pages without charge under its 100-free-pages rule. Having done so, the FTC declined to decide whether Action qualified for a public-interest or news-media waiver for the third request. Action filed another administrative appeal, which the FTC again denied, stating that the fee-waiver question was now moot.

Although Action's initial FOIA request simply asserted that Action was entitled to a fee waiver because it was a nonprofit organization, the agency record expanded significantly over the course of Action's dialogue with the FTC. All told, Action sent seven letters to the Commission in support of its fee-waiver applications. By the time of its appeal from the agency's denial of the fee-waiver applications for its third request, a much fuller picture of Action's activities and intentions had come into view. Action said that it planned to analyze the responsive records, use

its editorial skills to create distinct works, and share the resulting analysis with the public through a variety of channels, including its "regularly published online newsletter," its "regular periodicals" ("Agency Check" and "Cause of Action News"), its "frequently visited" website, and its Twitter and Facebook followings. Action Letter of 4/4/2012 at 6-7 (App. 181-82). Action also stated its intention to write two specific reports within two weeks of receiving the documents: one entitled "How the FTC Denies Fee Waivers to Organizations That Seek Information About FTC Operations," and the other entitled "The FTC and the Guides Concerning Endorsements: Why the Change?" *Id.* at 6. Finally, Action pointed the Commission to its history of "extensive publication activities," *id.* at 7, including examples of nearly twenty online articles published by other media outlets that "feature [Action's] work," Action Letter of 1/27/2012 at 3-4 & n.7 (App. 154-55); *see* Action Letter of 4/4/2012 at 7-8 & n.25 (App. 182-83).

B

On May 25, 2012, Action filed suit in the United States District Court for the District of Columbia, challenging both the Commission's decision to withhold some of the responsive records as exempt from disclosure and its denial of Action's applications for fee waivers. With respect to the withheld documents, the district court granted summary judgment for the Commission regarding most of the documents. Neither party has appealed that decision. With respect to the fee-waiver applications, the district court also granted summary judgment for the Commission. The court concluded that Action was not entitled to either category of fee waiver for the first two FOIA requests. And like the FTC, it declared the fee-waiver issues for the third request moot. *Cause of Action v. Federal Trade Comm'n*, 961 F. Supp. 2d 142 (D.D.C. 2013).

Action appeals the district court's adverse decisions with respect to its public-interest and news-media waiver applications and with respect to mootness. We review de novo both the district court's grant of summary judgment and the agency's denial of the fee-waiver applications. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1311 (D.C. Cir. 2003); 5 U.S.C. § 552(a)(4)(A)(vii) (providing that, "[i]n any action by a requester regarding the waiver of fees[,] . . . the court shall determine the matter de novo"). The same is true for the court's conclusion that the fee-waiver applications for the third FOIA request were moot. We address the mootness issue in Part II and the fee-waiver issues in Parts III and IV.

II

The FTC and the district court declared the fee-waiver issues moot for Action's third FOIA request on the ground that the Commission had already given Action the requested documents free of charge.[1] But in fact, the FTC had not -- and still has not -- produced all of those documents without charge. Indeed, as far as the record before us reflects, it has not produced all of those documents at all -- because Action has not paid for them.

---

[1]Following the parties' usage, we use the term "moot" in the colloquial sense to refer to an issue that is no longer of practical significance. Because the allegedly mooting event -- the FTC's asserted release of the documents without charge -- occurred *before* the district court litigation began, the question may be one of standing rather than mootness. *See generally Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000). Alternatively, if it were truly seeking fee waivers for documents that were released without fees, Cause of Action would have no cause of action. In the end, none of these distinctions matter because, as we discuss in the text, the FTC did *not* produce all of the requested documents without charge.

The Commission did produce without charge all non-exempt documents responsive to the new parts of the third request, because those documents numbered fewer than 100 pages. Accordingly, the fee issue is moot for those parts of the request. But a part of the third FOIA request *also* renewed Action's two earlier requests and sought to "perfect[]" them by providing supplemental information about Action's qualifications and recent activities. Action Letter of 1/27/2012 at 8-9 (App. 159-60).[2] The FTC had previously provided 100 pages free of charge in response to each of the first two requests, but it declined to produce the remaining pages until Action paid for them. *See, e.g.*, Gray Decl. ¶¶ 20-22 (App. 244-45) (declaring that the FTC provided 100 out of 156 pages in response to the second request). Nor did it provide the remainder in response to the third FOIA request's demand for them.

The Commission declined to process the part of the third request that sought previously requested documents on the ground that it was a "duplicate" of the earlier requests. FTC Letter of 3/19/2012 at 1 n.1 (App. 174). The government now grants that the agency "may have made a mistake." Oral Arg. Recording 52:37-53:43. It did. The third request sought documents that the FTC still had not produced because Action had not paid for them, and the Commission and the court were obliged to consider whether the continued denial of fee waivers with respect to those documents was warranted.

---

[2]*See* Action Letter of 1/27/2012 at 2 (App. 153) ("[I]n order to avoid litigation over a fee waiver denial, Cause of Action would like to provide additional information as part of an appeal of your fee waiver denial [for the second FOIA request], and hope that this information will prove helpful in reconsidering the original denial of a fee waiver [for the first request]." (emphasis omitted)).

Of course, if the third request had provided no new evidence in support of Action's applications for fee waivers, it would have been perfectly appropriate for the FTC and the court to rest their denials on their previous determinations that the evidence submitted with the first two requests was insufficient. But Action did provide more evidence of its qualifications. *See supra* Part I.A. Likewise, if Action had been peppering the FTC with repeated requests supported by only marginally relevant additional evidence, it might have been reasonable for the agency to decline to undertake repeated reconsideration. But this was only Action's third request, and it provided considerably more supportive evidence. Moreover, Action was a newly formed and quickly evolving organization trying to supplement the record with new evidence of its track record and intentions as they developed. There is no dispute about its good faith in doing so.

At oral argument, the FTC acknowledged that Action would be "entitled to present all this information" regarding its fee-waiver claims if it filed yet a fourth FOIA request seeking the very same records. *See* Oral Arg. Recording 1:10:40-1:11:05. The Commission is right about that. *See Spannaus v. Dep't of Justice*, 824 F.2d 52, 61 (D.C. Cir. 1987) (noting that, although the statute of limitations barred the requester's challenge to the agency's denial of his FOIA request, he could "simply refile his FOIA request tomorrow and restart the process"). But we see no material difference between such a new fourth request and the third request that Action actually did file prior to bringing suit in the district court.

Because the FTC has not produced without charge all the non-exempt documents Action sought in its third request, Action's applications for fee waivers are not moot. FOIA requires the district court to review the denial of a fee waiver based on "the record before the agency." 5 U.S.C.

§ 552(a)(4)(A)(vii). Because that record encompasses all of Action's submissions, including those in connection with its third request, the district court must review those submissions to determine whether Action qualified for the fee waivers it sought. Because that has not yet happened, we will remand the case to give the court an opportunity to conduct the required review.

III

In a number of particulars, Action challenges the ways in which the district court analyzed FOIA's public-interest and news-media provisions in connection with its fee-waiver applications for the first and second FOIA requests. We agree that there are problems in that analysis. Some of those problems can be laid at the feet of this court, which has provided relatively little guidance regarding the complexities of those two provisions. Some problems can be attributed to amendments to FOIA that have not yet been captured in judicial opinions. And some can be attributed to the FTC, which pressed erroneous interpretations of FOIA contained in its own regulations. In order to facilitate the district court's consideration on remand, we address Action's challenges below. We address the public-interest waiver provision in this Part and the news-media provision in Part IV.

The text of the public-interest waiver provision indicates that such a fee-waiver application must satisfy three criteria. Disclosure of the requested information must: (1) shed light on "the operations or activities of the government"; (2) be "likely to contribute significantly to public understanding" of those operations or activities; and (3) not be "primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The FTC has issued a regulation interpreting this statutory provision, *see* 16 C.F.R. § 4.8(e)(2), and both the Commission and the district court applied that

regulation in evaluating Action's fee-waiver applications. FOIA, however, requires the court "to determine the matter de novo," 5 U.S.C. § 552(a)(4)(A)(vii), and courts "owe no particular deference to [an agency's] interpretation of FOIA," *Rossotti*, 326 F.3d at 1313; *see Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001) ("[B]ecause FOIA's terms apply government-wide[,] . . . we generally decline to accord deference to agency interpretations of the statute, as we would otherwise do under *Chevron*.").

The district court concluded that Action's first and second FOIA requests failed to qualify for public-interest waivers. We consider below the law the court applied in reaching those conclusions.

A

The district court found that Action's first request -- for documents regarding the Commission's product-endorsement guides -- satisfied all of the elements it thought were required for a public-interest waiver, except one: Action had "not demonstrated that the requested information would increase understanding of the *public at large*." *Cause of Action*, 961 F. Supp. 2d at 156 (citing the FTC's fee-waiver regulation, 16 C.F.R. § 4.8(e)(2)(i)(C) (2012)). To do so, the court said, Action must demonstrate it has "the intent and ability to effectively convey the information to a broad segment of the public." *Id.* at 157.[3] According to the court, a FOIA requester "must identify several methods of disseminating the information and provide some concrete basis upon which the agency can

---

[3]Action's intent to convey the information was not at issue. The court doubted only that Action "has the ability" to reach a wide audience. *Cause of Action*, 961 F. Supp. 2d at 158.

conclude that those methods are adequate to convey the requested information to a wide audience." *Id.*

The FTC regulation cited by the district court does require a requester to show that the information it seeks would increase the understanding of the public "at large." 16 C.F.R. § 4.8(e)(2)(i)(C). But FOIA itself does not. The statute requires only that the disclosure be likely to contribute significantly to "public" understanding. 5 U.S.C. § 552(a)(4)(A)(iii). Nor does the statute require a requester to show an ability to convey the information to a "broad segment" of the public or to a "wide audience." To the contrary, we have held that "proof of the ability to disseminate the released information to a broad cross-section of the public is not required." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1126 (D.C. Cir. 2004); *see Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 814-15 (2d Cir. 1994) (rejecting the assertion that, because a scholar's proposed articles would not "reach a broad cross-section of the public" or "a general audience," his request did not come within the public-interest provision).

We recognize that the requirement that disclosure of the requested information be "likely to contribute *significantly* to public understanding" defies easy explication. Application of this criterion may well require assessment along two dimensions: the degree to which "understanding" of government activities will be advanced by seeing the information; and the extent of the "public" that the information is likely to reach.[4] The district court's focus was on the second

_____

[4]*See Carney*, 19 F.3d at 814 ("In determining whether disclosure of records will contribute significantly to the public's understanding of the operation or activities of the government, it is relevant to consider the subject matter of the requests and the ability of the requester to disseminate the information."); *Larson v. CIA*, 843 F.2d

dimension.[5]  But as we have said, FOIA does not require that a requester be able to reach a "wide audience." Rather, as the Second Circuit has held, "the relevant inquiry . . . is whether the requester will disseminate the disclosed records to a reasonably broad audience of persons interested in the subject." *Carney*, 19 F.3d at 815.  That standard is consistent with our precedent, *see Judicial Watch*, 365 F.3d at 1126; *Larson v. CIA*, 843 F.2d 1481, 1482 (D.C. Cir. 1988), and with the limited legislative history.[6]

---

1481, 1483 (D.C. Cir. 1988) (affirming denial of a fee waiver because, while "the subject matter of [the] request is of public interest," the requester failed to demonstrate an "[]ability to disseminate the information to the public").

[5]Regarding the first dimension, the court did not question the "informative value of the information" requested, *see Rossotti*, 326 F.3d at 1313, and did not disagree that a sufficient amount of this information was not yet in the public domain, *Cause of Action*, 961 F. Supp. 2d at 156; *see Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 36 (D.C. Cir. 1998).

[6]*Compare* 132 Cong. Rec. 27,191 (1986) (statement of Sen. Leahy) ("A request can qualify for a fee waiver even if the issue is not of interest to the public-at-large" because "[p]ublic understanding is enhanced when information is disclosed to the subset of the public most interested, concerned, or affected by a particular action or matter."), *with id.* at 31,424 (statement of Sen. Hatch) ("It is intended that the word 'significantly' . . . [and] the qualifying word 'public' be applied so as to require a breadth of benefit beyond any particularly narrow interests that might be presented."). Senators Leahy and Hatch were two of the three cosponsors of the amendment that created the current version of the public-interest provision. *See id.* at 26,763; *see also Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1384-85 (D.C. Cir. 1989) (explaining that, because this legislation was not referred to committee, "the statements of the sponsors of the bill" comprise the only relevant legislative history).

Nor must a requester "identify several methods of disseminating the information" it seeks, a requirement the district court found Action failed to meet because it "identified only two methods[,] . . . its website and articles published by news media that have relied upon [its] past work on other issues." *Cause of Action*, 961 F. Supp. 2d at 157. It is true, as the court noted, that in *Judicial Watch v. Rossotti* we found the requester had demonstrated its ability to disseminate the requested information by identifying "nine ways it communicates information to the public." *Id.* (citing *Rossotti*, 326 F.3d at 1314). But we did not suggest that number represented a necessary minimum. *See Rossotti*, 326 F.3d at 1314. There is nothing in the statute that specifies the number of outlets a requester must have, and surely a newspaper is not disqualified if it forsakes newsprint for (or never had anything but) a website.

We do agree with the district court that Action's initial submissions offered little information about whom the specific disclosures it sought could reasonably be expected to reach. Fee-waiver applicants must support their claims with "'reasonable specificity.'" *Rossotti*, 326 F.3d at 1312 (quoting *Larson*, 843 F.2d at 1483).[7] But whether Action cleared that bar with the substantial additional evidence it submitted with its third request -- evidence regarding its newsletter, periodicals, website, social media presence, planned reports, and press releases to media contacts -- must be addressed on remand. As

---

[7]*Cf. Larson*, 843 F.2d at 1483 ("Larson's allegations, as presented in the administrative record, failed to identify the newspaper company to which he intended to release the requested information, his purpose for seeking the requested material, or his professional or personal contacts with any major newspaper companies. The absence of this information demonstrates an inability to disseminate the information to the public.").

government counsel acknowledged at oral argument, even the FTC is "not in a position to say" that the complete agency record "isn't enough" for a fee waiver or reduction, "because it is a substantially greater showing than [Action] made with requests one and two." Oral Arg. Recording 54:30-42.

B

The district court found that Action's second FOIA request -- for documents concerning the FTC's history of granting public-interest fee waivers -- also failed to qualify for a public-interest waiver. It did so for several reasons.

1. First, the court again found that Action failed to show it had the ability to disseminate the requested information to a broad segment of the public. We need say no more about this "broad segment" requirement than we have just said in Part III.A.

2. The court further held that Action failed to qualify for a waiver "[b]ecause the *primary beneficiary* of the requested information is [Action]." *Cause of Action*, 961 F. Supp. 2d at 159 (emphasis added). The court acknowledged that Action planned to write a report about how the FTC grants public-interest waivers, and that the planned report "may well benefit the public." *Id.* But it agreed with the FTC that Action did not "primarily ma[k]e this second request in order to . . . benefit the public." *Id.* Rather, Action's "primary interest in the second request was . . . to better prepare itself for an appeal of its fee waiver denial of its first request." *Id.*

In applying a "primary beneficiary" test, the court relied on this circuit's decision in *National Treasury Employees Union v. Griffin*, which held that requesters must "indicate that a fee waiver or reduction will *primarily* benefit the public." 811 F.2d

644, 648 (D.C. Cir. 1987). *Griffin* was decided under the pre-1986 statute, which expressly authorized fee waivers only when "'furnishing the information can be considered as primarily benefitting the general public.'" *Id.* at 646-47 (quoting 5 U.S.C. § 552(a)(4)(A) (1982)); *see id.* at 647 n.2. In 1986, however, amendments to FOIA eliminated that requirement. *See* Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, § 1803, 100 Stat. 3207-48, 3207-50 (codified at 5 U.S.C. § 552(a)(4)(A)(iii) (2012)). Now the text requires only that the disclosure be "likely to contribute significantly to public understanding." *Id.*

It is still the case, of course, that a requester is ineligible for a waiver if the requested information will be to its benefit alone. The statute requires, after all, that the information contribute to *public* understanding. 5 U.S.C. § 552(a)(4)(A)(iii); *see Forest Guardians v. U.S. Dep't of Interior*, 416 F.3d 1173, 1179 (10th Cir. 2005) ("FOIA fee waivers are limited to disclosures that enlighten more than just the individual requester . . . ."). But since the 1986 amendments, it no longer matters whether the information will also (or even primarily) benefit the requester. Nor does it matter whether the requester made the request for the *purpose* of benefiting itself. The statutory criterion focuses only on the likely *effect* of the information disclosure.

3. In light of its conclusion that the second request failed to satisfy the public-interest provision in the above two ways, the district court found it unnecessary to resolve the FTC's contention that the request also failed because disclosure of the information was "'primarily in the commercial interest of the requester.'" *Cause of Action*, 961 F. Supp. 2d at 159 n.4 (quoting 5 U.S.C. § 552(a)(4)(A)(iii)). The court indicated, however, that if it "were to consider the commercial interest prong of the test, . . . it would likely find [Action's] second

request fails that as well, because of its nexus with the lawsuit [Action] filed against the agency." *Id.*

But Action's interest in information regarding the FTC's treatment of fee-waiver applications (including Action's own) is not rendered "commercial" merely because the information could help it obtain a fee waiver. *See McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987) (holding that FOIA "[i]nformation helpful to a tort claim furthers a requester's interest in compensation or retribution, but not an interest in commerce, trade, or profit"); *McClain v. U.S. Dep't of Justice*, 13 F.3d 220, 220 (7th Cir. 1993) ("McClain sought the documents primarily to facilitate a challenge to his conviction; this is not a 'commercial' interest.").[8] Of course, if a requester's only interest in a particular request is to further its own litigation, it may be difficult or impossible to show that disclosure of the information is likely to contribute significantly to public understanding. *See Carney*, 19 F.3d at 816; *McClain*, 13 F.3d at 221. But in that situation, the fee-waiver application runs aground on a different element of the public-interest test.

IV

Action contends that, even if it does not qualify for a public-interest fee waiver, it is entitled to a waiver of all but the FTC's copying costs because it is a "representative of the news media." 5 U.S.C. § 552(a)(4)(A)(ii)(II). Although Congress added this fee-waiver category to FOIA in the Freedom of Information Reform Act of 1986 (FIRA), Pub. L. No. 99-570,

---

[8]*See also* Office of Mgmt. & Budget, Uniform FOIA Fee Schedule & Guidelines, 52 Fed. Reg. 10,012, 10,017-18 (Mar. 27, 1987) (interpreting "commercial use" in 5 U.S.C. § 552(a)(4)(A)(ii) as a use that "furthers the commercial, trade or profit interests of the requester").

§ 1803, 100 Stat. 3207-48, 3207-50, we have issued only one opinion that has addressed its meaning in any detail, *Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381 (D.C. Cir. 1989), and none since Congress expressly defined the category in 2007, *see* OPEN Government Act of 2007, Pub. L. No. 110-175, § 3, 121 Stat. 2524, 2525 (codified at 5 U.S.C. § 552(a)(4)(A)(ii)).

A

In 1986, FIRA added the "representative of the news media" fee-waiver category to FOIA, but did not define which entities would qualify. FIRA § 1803, 100 Stat. at 3207-48 (codified at 5 U.S.C. § 552(a)(4)(A)(ii)(II)). It did, however, instruct the Office of Management and Budget (OMB) to promulgate "guidelines[,] . . . which shall provide for a uniform schedule of fees" to which individual agencies' fee guidelines had to conform. 5 U.S.C. § 552(a)(4)(A)(i); *see Media Access Project v. FCC*, 883 F.2d 1063, 1069 (D.C. Cir. 1989). Thereafter, OMB promulgated guidelines that defined a "representative of the news media" as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public." Uniform FOIA Fee Schedule & Guidelines, 52 Fed. Reg. 10,012, 10,018 (Mar. 27, 1987) [hereinafter OMB Guidelines]. The OMB Guidelines offered some textbook examples of news-media entities ("television or radio stations" and "publishers of periodicals"), but noted that those examples were "not intended to be all-inclusive." *Id.* The Guidelines also stated that, "as traditional methods of news delivery evolve (e.g., electronic dissemination of newspapers through telecommunications services), such alternative media would be included in this category." *Id.*

Two years later, in 1989, this court decided its principal case concerning the criteria for qualifying as a "representative of the news media." In *National Security Archive v. Department*

*of Defense*, we concluded that the Archive, a nonprofit institution, qualified.  880 F.2d at 1386.  In reaching that conclusion, we first explained that several of the Archive's activities were insufficient to establish news-media status because they were merely ways of "making information available to the public." *Id.*  We nonetheless found the Archive qualified because it also had "firm" plans to "publish a number of . . . 'document sets'" concerning United States foreign and national security policy. *Id.* at 1386.  The Archive intended "to obtain the raw materials for its document sets" from FOIA requests and other sources, "cull those of particular interest," and "then supplement the chosen documents with detailed cross-referenced indices, other finding aids, and a sophisticated computerized retrieval system." *Id.*  It would then sell the document sets to support its work. *Id.*  In this way, we explained, the Archive would "act, in essence, as a publisher." *Id.*  That qualified the Archive as a "representative of the news media," we said, in light of our understanding both that Congress intended us to interpret the term "broadly" and that the legislature saw an important distinction between "merely . . . making information available and publishing or otherwise disseminating that information." *Id.* (internal quotation marks and alterations omitted).

"Without suggesting that any one of [the Archive's] activities [was] either necessary or sufficient for a[n] . . . organization to be a 'representative of the news media,'" we concluded that the Archive was "well within" that category because it "gathers information from a variety of sources; exercises a significant degree of editorial discretion in deciding what documents to use and how to organize them; devises indices and finding aids; and distributes the resulting work to the public." *Id.* at 1387.  We then summarized our view as follows:

> A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.

*Id.*

In 2007, Congress again amended FOIA, this time to provide an express statutory definition of the news-media category. *See* OPEN Government Act § 3, 121 Stat. at 2525 (codified at 5 U.S.C. § 552(a)(4)(A)(ii)). Striving for a compromise that would "protect[] internet publications and freelance journalists" but still "preserve commonsense limits," Senator Kyl proposed, and Congress ultimately adopted, an amendment that incorporated "the definition of media requester that was announced by the DC Circuit in *National Security Archive*," 153 CONG. REC. 22,945 (2007) (statement of Sen. Kyl). In relevant part, the amended statute provides:

> In this clause, the term *"a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience*. . . . Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through

telecommunications services), such alternative media shall be considered to be news-media entities.

5 U.S.C. § 552(a)(4)(A)(ii) (emphasis added).[9]

The first, operative sentence of the statutory definition, taken directly from *National Security Archive*, is readily severable into five criteria that a requester must satisfy to qualify as a "representative of the news media." A requester must: (1) gather information of potential interest (2) to a segment of the public; (3) use its editorial skills to turn the raw materials into a distinct work; and (4) distribute that work (5) to an audience. *See* 5 U.S.C. § 552(a)(4)(A)(ii). In addition, the news-media fee waiver applies only to records that "are not sought for commercial use." *Id.* § 552(a)(4)(A)(ii)(II).

B

The district court found that Action satisfied the first two criteria because its first and second requests sought to gather information of potential interest to segments of the public: the first request, regarding the FTC's product-endorsement guides, would be of interest to "social media authors" and bloggers; and the second request, regarding fee-waiver denials, would be of interest to those who apply for such waivers. *Cause of Action*, 961 F. Supp. 2d at 162. The FTC does not dispute that finding.

---

[9]The portion of the statutory text that is not italicized derives from the 1987 OMB Guidelines. *See* 52 Fed. Reg. at 10,015. OMB has not issued any new guidelines since the 2007 OPEN Government Act. The portion of the text omitted by the ellipsis states: "In this clause, the term 'news' means information that is about current events or that would be of current interest to the public." Neither the FTC nor the court relied on this sentence in denying Action "representative of the news media" status.

Nor do we.  We do, however, want to sound a note of caution regarding an assumption underlying the court's analysis.

That analysis appears to require that each FOIA *request* be for information that is of potential interest to a segment of the public.  Such a case-by-case approach is correct for the public-interest waiver test, which requires that the "disclosure of the [requested] information" be in the public interest.  5 U.S.C. § 552(a)(4)(A)(iii).  But the news-media waiver, by contrast, focuses on the nature of the *requester*, not its request.  The provision requires that the request be "made by" a representative of the news media.  *Id.* § 552(a)(4)(A)(ii)(II).  A newspaper reporter, for example, is a representative of the news media regardless of how much interest there is in the story for which he or she is requesting information.[10]

So, too, for Action.  If it satisfies the five criteria as a general matter, it does not matter whether any of the individual FOIA requests does so.  This does not mean that the specific requests are irrelevant.  For example, showing that those requests are of potential interest to a segment of the public is one way of showing that the entity satisfies the first two criteria for news-media status.  Indeed, it may be the best way to satisfy those criteria for a new entity that lacks a track record or that employs FOIA requests as its principal means of gathering information -- both of which appear to describe the appellant in this case.  But the statute's focus on requesters, rather than requests, does mean that evidence of Action's news-media status

---

[10]There is a caveat:  If a news-media entity makes the request in its corporate rather than journalistic capacity, the request does not qualify for a fee waiver because it founders on the additional requirement that the records not be "sought for commercial use."  *Id.* § 552(a)(4)(A)(ii)(II); *see Nat'l Sec. Archive*, 880 F.2d at 1387.

is not limited to what it establishes about the three FOIA requests that are the subject of this litigation.

C

The district court found that Action did not satisfy the third news-media criterion -- that it uses its editorial skills to turn raw material into a distinct work -- because it did not "demonstrate that it would use information from a range of sources to independently produce a unique product." *Cause of Action*, 961 F. Supp. 2d at 162. The court noted that, in *National Security Archive*, the requester "was gathering raw material from a wide variety of sources in addition to the FOIA requests at issue in order to create 'document sets' on specific topics." *Id.* (citing *Nat'l Sec. Archive*, 880 F.3d at 1386). Action is not like the Archive, the court said, because it "did not indicate [1] any distinct work it planned to create based on the requested information or [2] that it would use any information beyond that obtained in the FOIA requests to create any unique product." *Id.*

1. We are not sure that we understand the first point in the preceding sentence because, as noted in Part III.B.2 above, the district court acknowledged that Action did in fact indicate at least one distinct work that it planned to create: "a report describing how the FTC grants public interest fee waivers." *Cause of Action*, 961 F. Supp. 2d at 159; *see* Action Letter of 4/4/2012 at 6 (App. 181). It may be that the court disregarded that report (and a second planned report concerning the FTC's product-endorsement guides) because Action did not specify it until it filed supplemental materials in support of its third FOIA request. As we said in Part II, however, those supplemental materials are part of the administrative record and must be examined on remand.

We also note that the district court did not consider the possibility, which the FTC resisted, that a news-media entity could create a "distinct work" by commenting to other outlets about documents it obtains under FOIA.  At oral argument, however, the FTC conceded that editorial skill could be manifested in a distinct work of that kind. Indeed, it recognized that, if an entity (such as Action) issues substantive press releases concerning the documents it uncovers, or even if it simply provides editorial comments on those documents in interviews with newspapers, such a gloss on the underlying materials could satisfy this element of the definition.  *See* Oral Arg. Recording 56:57-57:28.

We agree.  A substantive press release or editorial comment can be a distinct work based on the underlying material, just as a newspaper article about the same documents would be -- and its composition can involve "a significant degree of editorial discretion," *Nat'l Sec. Archive*, 880 F.2d at 1387.  Although we agree with the district court that Action's first application for news-media status was too conclusory in explaining the kind of works it would produce and disseminate, *see* Action Letter of 9/26/2011 at 1 (App. 26); *Rossotti*, 326 F.3d at 1312 (holding that fee-waiver applications must be "based on more than conclusory allegations" (internal quotation marks omitted)), the materials supporting Action's third request cite a large number of articles and releases.  And as we have said, they also include descriptions of particular public reports that Action planned to write.  *See Cause of Action*, 961 F. Supp. 2d at 162 n.6.  Those materials are part of the administrative record and will be before the district court on remand.

2. The court's second point -- that Action failed to indicate it would use any information beyond that obtained in the FOIA requests -- does not bear on the statutory qualifications for a news-media waiver.  The statute does not require that a

requester gathers information "from a range of sources" or a "wide variety of sources," *Cause of Action*, 961 F. Supp. 2d at 162. It requires only that the requester "gathers information." 5 U.S.C. § 552(a)(4)(A)(ii). As we explained above, nothing in principle prevents a journalist from producing "distinct work" that is based exclusively on documents obtained through FOIA.

The district court was correct that, in *National Security Archive*, we observed that the requester's activities included "gather[ing] information from a variety of sources." 880 F.2d at 1387. But we also said we were not "suggesting that any one of [the Archive's] activities is either necessary or sufficient" for an entity to qualify as a representative of the news media. *Id.* And our summary description of such an entity, which Congress enacted as the statutory definition in 2007, made no mention of that factor. *See* OPEN Government Act § 3, 121 Stat. at 2525 (codified at 5 U.S.C. § 552(a)(4)(A)(ii)). Accordingly, there are no grounds for finding it necessary to news-media status.

D

The district court also found that Action failed to satisfy a combination of the fourth and fifth criteria -- that it "distributes [its] work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). To satisfy those criteria, the court said, a requester must do two things: It "[1] must demonstrate that it has the intent and ability to disseminate the requested information to the public rather than merely make it available; [and 2] must also demonstrate that its operational activities are especially organized around doing so." *Cause of Action*, 961 F. Supp. 2d at 162. In context, those two requirements impose a greater burden than the statute demands.

1. Before considering the way in which the district court applied its first requirement to Action, we note two concerns

about its verbal formulation.  First, by focusing on Action's intent and ability to disseminate "the requested information" rather than information in general, this formulation again looks to the nature of the *request* rather than of the *requester*.  As we noted above, however, the news-media provision focuses on the latter.

Second, the parties and amici skirmish over the court's suggestion that a qualifying requester must disseminate information "rather than merely make it available."  Their disagreement appears to be more semantic than substantive.  On the one hand, the court is right that merely making information available is not the same as distributing it.  In *National Security Archive*, for example, we suggested that it would not have been enough for the Archive to collect its document sets in its "private research institute and library," 880 F.2d at 1386, even though they would be "available for public use" there, *id.* at 1383.  On the other hand, the amici are right that *"The New York Times* [and] *The Washington Post*" are news media, even "when publishing something only on their websites."  Br. of Amici Reporters Comm. for Freedom of the Press, et al. 15.

As the district court implicitly recognized, *see generally Cause of Action*, 961 F. Supp. 2d at 163, posting content to a public website can qualify as a means of distributing it -- notwithstanding that readers have to affirmatively access the content, rather than have it delivered to their doorsteps or beamed into their homes unbidden.  *National Security Archive* understood distribution in terms of "the kind of initiative we associate with publishing or otherwise disseminating" information.  880 F.2d at 1386 (internal quotation marks omitted).  But our understanding of that kind of initiative is

naturally somewhat different today than it was in 1989,[11] and the statute requires us to take that into account. *See* 5 U.S.C. § 552(a)(4)(A)(ii) (instructing that, "as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities").[12]

2. Even with the recognition that online dissemination can qualify as a means of distribution, the district court found Action's submissions insufficient to show it distributes its work to an audience because it "has not estimated how many people

_____

[11]We decided *National Security Archive* only months after Tim Berners-Lee submitted his grant proposal for what would become the World Wide Web. *See* Larry Greenemeier, *Remembering the Day the World Wide Web Was Born*, SCIENTIFIC AMERICAN, Mar. 12, 2009, http://www.scientificamerican.com/article/day-the-web-was-born.

[12]*See also* 153 CONG. REC. 22,944 (2007) (statement of Sen. Leahy, cosponsor of the OPEN Government Act) (stating that the "bill ensures that federal agencies will not automatically exclude Internet blogs and other Web-based forms of media"); *id.* at 22,947 (statement of Sen. Cornyn, another cosponsor) (stating that the bill "grants the same privileged FOIA fee status currently enjoyed by traditional media outlets to bloggers and others who publish reports on the Internet").

In 2012, 46% of Americans reported that they obtained news online or on a mobile device at least three days a week; that number was 4% in 1996. *Compare* Pew Research Center for People and the Press, *In Changing News Landscape, Even Television Is Vulnerable* 14-15 (2012), http://www.people-press.org/files/legacy-pdf/2012%20News%20Consumption%20Report.pdf, *with* Pew Research Center for People and the Press, *One-in-Ten Voters Online for Campaign '96: News Attracts Most Internet Users* 15 (1996), http://www.people-press.org/files/legacy-pdf/117.pdf.

view its website or social media, nor has it indicated whether its media contacts would write about the requested information." *Cause of Action*, 961 F. Supp. 2d at 163.  In addition, the court said, Action's newsletter "did not even exist until after it made its first FOIA request, and had only been published for a month when it filed its second request" -- unlike a newsletter analyzed in an earlier case, which had been published for eight years and reached 15,000 readers. *Id.* (citing *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 12-13 (D.D.C. 2003)).[13]

There is no doubt that the requirement that a requester distribute its work to "an audience" contemplates that the work is distributed to more than a single person.[14]   But beyond requiring that a person or entity have readers (or listeners or viewers), the statute does not specify what size the audience must be.  Indeed, in *Tax Analysts v. Department of Justice*, we said that the publisher of a weekly tax magazine was "certainly" a news media entity under *National Security Archive*, holding that "[t]he fact that [its] readership is relatively small . . . is irrelevant."  965 F.2d 1092, 1095 (D.C. Cir. 1992).

Nor is it disqualifying that Action's newsletter did not exist at the time it made its first FOIA request.  It is true that the statute uses present-tense verbs -- "gathers," "uses," and "distributes" -- that characterize a present state of being, not just

---

[13]The court acknowledged that Action provided more information in an April 2012 letter to the FTC, but declined to examine it because it was submitted in reference to Action's third FOIA request, which the court had found to be moot. *Cause of Action*, 961 F. Supp. 2d at 162 n.6.

[14]*But see* MANFRED PFISTER, THE THEORY AND ANALYSIS OF DRAMA 36 (1993) (noting that "Mad King" Ludwig II was known to arrange "performances of Wagner operas with himself as an audience of one").

a set of aspirations. 5 U.S.C. § 552(a)(4)(A)(ii). But this does not mean that a new news-media venture cannot qualify as a "representative of the news media" until it has a track record. Although a bare statement of intent is not enough to qualify, firm plans can be. In *National Security Archive*, for example, we approved the Archive's news-media status based on its "firm intention," reflected in a grant proposal and other submissions to the agency, to produce and distribute the document sets it described. 880 F.2d at 1386. The 1987 OMB Guidelines likewise recognized that "a newly established newspaper" could qualify for news-media status "by demonstrating that it had held itself out for subscription and had in fact enrolled subscribers." 52 Fed. Reg. at 10,015. Against this backdrop, there is no indication that Congress meant to make the lack of a prior publication record disqualifying when it enacted the statutory definition in 2007.

The news-media provision requires a fact-based determination of whether a particular requester's description of its past record, current operations, and future plans jointly suffice to qualify it as a representative of the news media. For a requester that serves (or plans to serve) the public through multiple outlets -- here, newsletters, press releases, press contacts, a website, and planned reports -- those must be considered in combination. An entity with an extensive record will ordinarily qualify with only a thin recital of its plans (or perhaps none at all). Conversely, an entity with little or no historical record of distributing its work (like the National Security Archive) may make up for that absence by concretely setting out its plans to do so.

3. Finally, the district court also found that Action failed to qualify for a news-media waiver because it did not show that its "activities are organized especially around dissemination" of its work to an audience. *Cause of Action*, 961 F. Supp. 2d at 163.

A requester that "performs its activities to aid in government accountability," the court said, is "more like a middleman for dissemination to the media" than a representative of the news media. *Id.* at 164.

The district court's embrace of the "organized especially around dissemination" requirement reflected the FTC's then-operative regulation, which defined a "representative of the news media" as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public." 16 C.F.R. § 4.8(b)(2) (2013). That language, in turn, was derived from the definition in the 1987 OMB Guidelines. *See* OMB Guidelines, 52 Fed. Reg. at 10,018 (limiting the news-media category to a "person actively gathering news for an entity that is organized and operated to publish or broadcast" news).

Congress, however, omitted the "organized and operated" language when it enacted the statutory definition in 2007. Congress' text instead tracked this court's definition in *National Security Archive*, which did not include such a requirement. *Compare* 5 U.S.C. § 552(a)(4)(A)(ii)*, with Nat'l Sec. Archive*, 880 F.2d at 1387. Perhaps recognizing that difference -- albeit after Action filed this lawsuit -- the FTC has recently revised its regulation to omit the "organized and operated" requirement and track the statutory language. *See* 16 C.F.R. § 4.8(b)(2)(iii) (2014); *see also* 78 Fed. Reg. 13,570, 13,572 (2013) ("propos[ing] to amend the definitions for 'representative of the news media' to implement the definition codified . . . by the 2007 FOIA Amendments"); 79 Fed. Reg. 15,680 (2014) (adopting the proposed amendment). Accordingly, there is no

basis for adding an "organized and operated" requirement to the statutory definition.[15]

We also disagree with the suggestion that a public interest advocacy organization cannot satisfy the statute's distribution criterion because it is "more like a middleman for dissemination to the media than a representative of the media itself," *Cause of Action*, 961 F. Supp. 2d at 164; *see id.* at 157. It is true that "middlemen" that merely disseminate the documents they receive to the media (or others) do not qualify. *See Nat'l Sec. Archive*, 880 F.2d at 1387.[16] That is because what is distributed must independently qualify as "distinct work" produced through the exercise of "editorial skills." *Id.*; *see supra* Part IV.C. But assuming that these other criteria are satisfied, there is no indication that Congress meant to distinguish between those who reach their ultimate audiences directly and those who partner with others to do so, as some recognized journalistic enterprises

---

[15]Although we reject the "organized and operated" requirement, we agree that a requester seeking news-media status generally must demonstrate more than an intention to engage in an isolated episode of journalistic activity. As we have explained, the news-media provision covers a certain kind of person or entity, not a certain kind of request, and we therefore doubt that a requester could qualify based on even a firm plan to undertake journalistic activity on a purely one-off basis. *See Nat'l Sec. Archive*, 880 F.2d at 1386 (citing Senator Leahy's statement that "any person or organization which *regularly* publishes or disseminates information to the public . . . should qualify for waivers as a 'representative of the news media'" (emphasis added)).

[16]Relying on floor statements by Senator Hatch, *National Security Archive* described the disfavored "middlemen" category as comprising "'intermediar[ies]' or 'information vendors [or] data brokers' [] that request documents for use by others." 880 F.2d at 1387 (quoting 132 CONG. REC. S14,040 (Sept 27. 1986); *id.* at S16,505 (Oct. 15, 1986)).

do.[17]  Indeed, the government now accepts that an entity may "distribute[] [its] work" by issuing press releases to media outlets in order to reach the public indirectly.  *See* Oral Arg. Recording 1:00:10-1:02:43.

## V

We conclude that Action's applications for fee waivers in connection with its outstanding FOIA requests are not moot, and that its entitlement to a public-interest or news-media fee waiver must be reconsidered in light of the full agency record and the clarifications set out above.  We therefore remand this case for further proceedings consistent with this opinion.

*So ordered.*

---

[17]*See, e.g.*, ProPublica: Journalism in the Public Interest, *About Us*, http://www.propublica.org/about ("Many of our 'deep dive' stories are offered exclusively to a traditional news organization, free of charge, for publication or broadcast.").