# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 7, 2018          Decided August 3, 2018

No. 16-5333

GREGORY BARTKO,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01135)

*Sophia M. Brill*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *Brian M. Matsui* and *Deanne E. Maynard*.

*Gregory Bartko*, *pro se*, filed the briefs for appellant.

*Joshua M. Kolsky*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Alessio Evangelista*, Principal Assistant U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GRIFFITH, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by MILLETT, *Circuit Judge*.

MILLETT, *Circuit Judge*: "Whatever it takes, this behavior must stop." So ordered the United States Court of Appeals for the Fourth Circuit in *United States v. Bartko*, when it was confronted with "repeat offense[s]" of prosecutorial misbehavior and discovery improprieties by the United States Attorney's Office for the Eastern District of North Carolina, including by Clay Wheeler, a high-level prosecutor in Gregory Bartko's case. 728 F.3d 327, 343, 341 (4th Cir. 2013). Concluding that the frequent recurrence of prosecutorial missteps in that office "raise[d] questions regarding whether the errors are fairly characterized as unintentional," the Fourth Circuit took the extraordinary step of referring the matter to the United States Department of Justice's Office of Professional Responsibility ("OPR") for further investigation of the allegations of professional misconduct. *Id.* at 342–343.

After Bartko was convicted in a case beset by prosecutorial misfeasance, he filed multiple Freedom of Information Act ("FOIA") requests with OPR and other relevant agencies seeking to learn the results of investigations into Wheeler. *See* 5 U.S.C. § 552 *et seq.* OPR categorically refused to acknowledge the existence of, let alone disclose, any potentially relevant documents outside of Bartko's individual case. And even with respect to Wheeler's conduct in Bartko's case, OPR held back substantial amounts of material, asserting a sweeping breadth for its claimed exemptions. Because circuit precedent foreclosed OPR's approach, and because OPR failed to justify multiple withholdings, we reverse the district court's judgment in favor of OPR with respect to its invocations of Exemption 7(C), and the district court's decision to deny a fee waiver to Bartko. We also remand with instructions for the district court to reconsider its decision with respect to the FBI's withholding of records pursuant to Exemption 3 in light of recent circuit precedent. On all other

matters, we affirm the district court's entry of summary judgment in favor of the defendant agencies.

**I**

**A**

The events giving rise to this appeal stem from a criminal prosecution in a district not too far from here. Gregory Bartko was an Atlanta-based securities lawyer, investment banker, and broker. In the early 2000s, he created and managed two private equity funds, the Caledonian Fund and the Capstone Fund. Over the next half-decade, Bartko fleeced investors out of more than a million dollars under the false pretense that their investments were fully insured with a guaranteed return. Bartko's luck ran out when the Securities and Exchange Commission caught wind of the scam and began to examine the Caledonian and Capstone Funds. The ensuing investigation resulted in a criminal prosecution by the U.S. Attorney's Office for the Eastern District of North Carolina. The then-Chief of the Economic Crimes Section, Assistant U.S. Attorney Clay Wheeler, prosecuted Bartko for (i) conspiracy to commit mail fraud and to engage in unlawful monetary transactions in violation of 18 U.S.C. § 371; (ii) mail fraud in violation of 18 U.S.C. §§ 1341 and 1342; and (iii) the sale of unregistered securities in violation of 15 U.S.C. §§ 77e, 77x, and 18 U.S.C. § 2. After a thirteen-day trial, a jury convicted Bartko on all counts. In 2010, Bartko was sentenced to 272 months of imprisonment. *See Bartko*, 728 F.3d at 331, 334; *see also Gregory Bartko v. SEC*, 845 F.3d 1217, 1221 (D.C. Cir. 2017) (describing Bartko's criminal activities).

Months after the jury announced its verdict, Bartko discovered that Wheeler had made multiple, serious

4

prosecutorial missteps in the case. Specifically, Wheeler failed to disclose significant impeachment evidence—deals that the government had struck with witnesses in advance of their testimony. *See Giglio v. United States*, 405 U.S. 150, 155 (1972); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963). In addition, the prosecution allowed a government witness (Bartko's co-conspirator) to testify falsely that he had not received any inducement from the government in exchange for his testimony, even though the government actually had made promises to him. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959); *see generally Bartko*, 728 F.3d at 337–341.

In light of those developments, Bartko moved for a new trial claiming violations of his due process rights under the Fifth Amendment. The district court denied Bartko's motion. The Fourth Circuit affirmed on the narrow ground that the undisclosed evidence and witness testimony was cumulative of the overwhelming untainted evidence, and so the governmental missteps would not have affected the final outcome of the trial. *See Bartko*, 728 F.3d at 331–332, 337.

But the court of appeals did not end its decision there. Pointing to a slew of disturbing recent cases, the court specifically noted the "frequency of [discovery] 'flubs' committed" by the U.S. Attorney's Office for the Eastern District of North Carolina, which "raise[d] questions regarding whether the errors [we]re fairly characterized as unintentional." *Bartko*, 728 F.3d at 341. With respect to Bartko's case in particular, the court expressed deep skepticism about counsel's "farfetched assertion" when asked about the misbehavior. *Id.* at 342.

The court also worried that "[r]emedies elude" individual defendants because egregious violations "ultimately prove immaterial to the verdict." *Bartko*, 728 F.3d at 342. The

frequent affirmance of criminal convictions on that basis, the court explained, causes the government to believe that it can withhold with impunity material that it is constitutionally required to disclose. Just because "such practices [may be] 'harmless' as to a specific defendant's verdict," the court continued, "they are anything but harmless" for "litigants in the Eastern District of North Carolina and our justice system at large[.]" *Id.*

Concluding that the U.S. Attorney's Office "is uninterested in placating concerns" and "seems unfazed by the fact that discovery abuses violate constitutional guarantees and misrepresentations erode faith that justice is achievable[,]" the court declared that "[s]omething must be done." *Bartko*, 728 F.3d at 342. "To underscore [its] seriousness about this matter," the Fourth Circuit ordered the Clerk of Court to "serve a copy of [its] opinion upon the Attorney General of the United States and the Office of Professional Responsibility[,]" which handles allegations of misbehavior by Justice Department attorneys. *Id.*

Faced with that sharp censure, the U.S. Attorney's Office responded by petitioning the court for rehearing, specifically requesting that the court "reconsider its suggestion that discovery errors in our office are intentional [and] that [Assistant U.S. Attorney Wheeler] intentionally ignored false testimony." Gov't's Pet. for Reh'g 2, Docket No. 12-4298, ECF No. 105. In its filing, the U.S. Attorney's Office "admit[ted]" to "some discovery failures on [its] part," *id.* at 3, and informed the court that it was instituting changes to its "[d]iscovery [p]ractices in [r]esponse to the [c]ourt's [c]oncerns," *id.* at 4. Specifically, the U.S. Attorney's Office announced that, effective August 1, 2013, Assistant U.S. Attorneys must:

(1)   personally review the files of each investigative agency involved with the investigation (rather than relying upon the agency's response to [the Office's] requests for discoverable material), and

(2)   meet with their supervisor to discuss this review and all potential discovery issues in the case.

*Id.* The U.S. Attorney's Office also "created new systems, protocols, and rules to comply with [its] reformulated discovery practices." *Id.* at 5. The Fourth Circuit denied the U.S. Attorney's Office's rehearing petition.

**B**

"The FOIA was enacted to ensure public access to a wide range of government reports and information." *Rural Housing Alliance v. United States Dep't of Agriculture*, 498 F.2d 73, 76 (D.C. Cir. 1974). It "was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Citizens for Responsibility & Ethics in Washington ("CREW") v. Department of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (quotation marks omitted).

While transparency and government accountability are at the heart of FOIA's mandate, Congress exempted certain categories of records from disclosure to protect important governmental and private interests in confidentiality. As relevant here, FOIA allows the government to withhold from disclosure information "compiled for law enforcement purposes * * * [that] could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), or that is "specifically exempted from

disclosure by [another] statute[,]" *id.* § 552(b)(3), such as material presented to a grand jury, FED. R. CRIM. P. 6(e). FOIA Exemption 6 separately shields "personnel and medical files and similar files" when their disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The agency bears the burden of proving that an exemption applies. *CREW*, 746 F.3d at 1088.

Even when an exemption applies, the agency is obligated to disclose "[a]ny reasonably segregable portion of a record" after removing the exempt material and must note the "amount of information deleted, and the exemption under which the deletion is made." 5 U.S.C. § 552(b).

An agency is permitted to charge a requester "reasonable" document search and duplication fees, 5 U.S.C. § 552(a)(4)(A)(ii)(III), but such fees will be waived or reduced if "disclosure of the information is in the public interest," *id.* § 552(a)(4)(A)(iii). The public-interest fee waiver requires that the released information be "likely to contribute significantly to public understanding" of government activities and not be "primarily in the commercial interest of the requester." *Id.*

## C

Between 2012 and 2013, Bartko submitted FOIA requests to OPR, the U.S. Postal Inspection Service, the Internal Revenue Service, the Federal Bureau of Investigation, the Department of Justice's Executive Office for U.S. Attorneys, the Department of Treasury, and the Securities and Exchange Commission. His requests sought government documents concerning both his case and any other records OPR might

possess regarding allegations of prosecutorial misconduct by Wheeler.

Of relevance here, in January 2013, Bartko submitted a FOIA request to OPR seeking:

1. Any and all records created by and/or received by [OPR] in regard to [AUSA] Clay C. Wheeler, * * * which relate to or concern violations or alleged violations by AUSA Wheeler of Section 9.500 et seq. of the United States Attorneys' Manual adopted by the Department of Justice; or the "Ogden Memorandum" * * * or any ethical duties imposed upon AUSA Wheeler in his capacity as a government prosecutor as set forth in the North Carolina Code of Professional Conduct * * *.

2. Any and all records in regards to complaints or allegations made against AUSA Wheeler with regards to prosecutorial misconduct before any grand jury, during any criminal trial or investigation prior to trial, which involved the withholding and concealing of exculpatory evidence and/or the presentation of false or misleading evidence during trial.

3. Any and all records maintained by OPR concerning AUSA Wheeler's supervision as an employee of the Department of Justice, which reflect allegations of

> attorney misconduct involving violations of any standard imposed by law, applicable rules, professional conduct or Department of Justice policy.

J.A. 209–210.

In response, OPR agreed only to release documents regarding a matter for which Bartko was the complainant (seven documents in total). As to everything else, OPR categorically refused to even confirm or deny the existence of relevant records—a type of answer to a FOIA request known as a "*Glomar*" response. *See Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).[1]

Dissatisfied with OPR's blanket refusal and the other agencies' responses, Bartko filed suit in the U.S. District Court for the District of Columbia in July 2013. The district court required the agency to search for records regarding Wheeler's missteps in Bartko's case but otherwise accepted OPR's categorical refusal to respond. *See Bartko v. Department of Justice*, 62 F. Supp. 3d 134, 143–144 (D.D.C. 2014). After conducting a narrowly tailored search, OPR invoked a host of exemptions to partially or fully withhold documents from Bartko. The district court approved those withholdings. *See*

---

[1] The *Glomar* response takes its name from this court's decision upholding the CIA's refusal to confirm or deny the existence of records about "the Hughes Glomar Explorer, a ship used in a classified [CIA] project to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts." *Roth v. Department of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (internal citation and quotation marks omitted).

*Bartko v. Department of Justice*, 128 F. Supp. 3d 62, 72–73 (D.D.C. 2015).

After years of back-and-forth between the parties and the court that resulted in a substantial amount of additional material being released to Bartko by OPR and the other defendant agencies, the district court granted summary judgment in favor of the defendants.   Bartko appealed *pro se*, and this court appointed an *amicus curiae* to present arguments on his behalf.[2]

## II

This Court reviews a district court's grant of summary judgment *de novo.*   *Clemente v. FBI*, 867 F.3d 111, 116, 119 (D.C. Cir. 2017).   Fee waiver denials are likewise reviewed *de novo*.   *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1311 (D.C. Cir. 2003).

Upon review of the record before us, we reverse the district court's grant of summary judgment in favor of OPR on its application of Exemption 7(C) and, in light of intervening circuit precedent, we remand the issue of whether the FBI's application of Exemption 3 was properly justified.   We also reverse the district court's denial of a fee waiver because Bartko has successfully shown that the disclosure of the requested material would be in the public's interest.   As to Bartko's other challenges to the agencies' withholdings and the scope of their FOIA searches, we affirm.

---

[2] The court thanks court-appointed *amicus curiae*, Sophia M. Brill, Deanne E. Maynard, and Brian R. Matsui of Morrison & Foerster LLP for their assistance in presenting this case.

**A**

Bartko's FOIA request to OPR sought any records pertaining to alleged misconduct by Wheeler, but the district court ruled that OPR need only disclose documents pertaining to Bartko's own case. As to the broader aspect of Bartko's request, the district court sustained OPR's *Glomar* response—OPR's blanket refusal to neither confirm nor deny the existence of other relevant records on the ground that doing so would reveal law-enforcement information protected from disclosure under Exemption 7(C). That was error.

A *Glomar* response to a FOIA request is permitted in that rare situation when either confirming or denying the very existence of records responsive to a request would "cause harm cognizable under an FOIA exception." *Roth v. Department of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (internal citation and quotation marks omitted); *see also American Civil Liberties Union v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (*Glomar* responses only permitted "in limited circumstances") (citation omitted). The question in this case is whether disclosing even "the existence or nonexistence of the requested records" is itself information protected by Exemption 7(C). *Roth*, 642 F.3d at 1178 (internal alteration omitted).

Because Exemption 7(C) shields from disclosure "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), to invoke *Glomar*, OPR had to make a threshold showing that the FOIA request seeks records "compiled for law enforcement purposes." *Jefferson v. Department of Justice*, 284 F.3d 172, 176 (D.C. Cir. 2002). OPR also bore the burden of making an across-the-board showing that the privacy interest the government asserts categorically outweighs any public interest

in disclosure. *See Roth*, 642 F.3d at 1174. OPR fell short on both fronts.

**1**

Documents pertaining to any OPR investigation of alleged ethics violations by Wheeler do not, on this record, qualify as protected "law enforcement records," 5 U.S.C. § 552(b)(7). The law-enforcement-purpose inquiry focuses "on how and under what circumstances the requested files were compiled," and "whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding[.]" *Jefferson*, 284 F.3d at 177 (internal citations and quotation marks omitted). The purpose of the investigation is "the critical factor." *Rural Housing Alliance*, 498 F.2d at 82.

To qualify as law-enforcement records, the documents must arise out of "investigations which focus directly on specifically alleged illegal acts * * * which could, if proved, result in civil or criminal sanctions." *Rural Housing Alliance*, 498 F.2d at 81. Records documenting only "government surveillance or oversight of the performance of duties of its employees" do *not* qualify. *Id.*; *see also Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984) (Exemption 7 does not shield internal agency investigations "in which an agency, acting as the employer, simply supervises its own employees."). Nor is the mere possibility of a legal violation sufficient, because "[a]ny internal auditing or monitoring conceivably could result in disciplinary action, in dismissal, or indeed in criminal charges against the employees." *Rural Housing Alliance*, 498 F.2d at 81.

Instead, an agency must establish "a rational nexus between the investigation and one of the agency's law enforcement duties," and "a connection between an individual

or incident and a * * * violation of federal law." *Center for Nat'l Sec. Studies v. Department of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003) (internal citation and quotation marks omitted). Courts generally afford some deference to agencies "specializing in law enforcement" that claim their records are eligible for Exemption 7(C) protection. *Id.* (internal quotation marks and alteration omitted).

Because OPR does not "specialize[] in law enforcement," its attempt to shield its records under Exemption 7(C) merits no deference. *Campbell v. Department of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998). We have previously "decline[d] to hold as a matter of law that all OPR records are necessarily law enforcement records." *Jefferson*, 284 F.3d at 178. That is because one of OPR's primary responsibilities is to "secure reports, as distinct from compiling them, that arise as a result of *internal agency monitoring* and review allegations of *non-law violations* by Department attorneys for internal disciplinary purposes." *Id.* (emphases added). So OPR bears the burden of showing on a case-by-case basis that any requested records were actually compiled for law-enforcement, rather than employment-supervision, purposes. *See id.*

The government has not come close to showing that all records (if there are more) involving misconduct allegations against Wheeler would have been compiled for law enforcement purposes. Bartko's FOIA request was broadly worded to include a wide variety of actual or alleged violations by Wheeler of the U.S. Attorney's Manual, the North Carolina Code of Professional Conduct, and other ethical and legal obligations. While violations of some of those standards could conceivably result in civil or criminal sanctions, many of them would not, and would bear only on internal disciplinary matters.

In addition, Bartko's request was not even limited to records resulting from OPR *investigations*, but included any records addressing alleged or actual misconduct by Wheeler. *See* J.A. 209 ("[R]ecords created by and/or *received by* [OPR] * * * which relate to or concern violations or alleged violations by AUSA Wheeler[.]") (emphasis added); J.A. 210 ("Any and all records maintained by OPR *concerning AUSA Wheeler's supervision as an employee* of the Department of Justice, which reflect allegations of attorney misconduct[.]") (emphasis added).

In defense of its sweeping *Glomar* response, OPR offered only a bare-bones declaration that "[t]he records requested by [Bartko] from OPR consist of complaints or allegations of misconduct which, if they exist, would have been compiled as part of OPR's investigations of Department of Justice attorneys who are alleged to have committed specific acts of professional misconduct which, if proved, could result in civil or criminal penalties." J.A. 207. That is not even in the ballpark. As we previously held, OPR "cannot rely on a bare assertion to justify invocation of an exemption from disclosure," especially when, as in Bartko's case, OPR's responsibilities include "receiv[ing] as well as generat[ing] reports that may constitute investigatory records compiled 'in connection with government oversight of the performance of duties by its employees.'" *Jefferson*, 284 F.3d at 179 (citation omitted); *see also CREW*, 746 F.3d at 1102 (finding that a "near-verbatim recitation of the statutory standard is inadequate" to justify the use of an exemption).

Demanding specification and tailored explanations from OPR has become even more important in the sixteen years since *Jefferson*. At the time of *Jefferson*, OPR maintained an actual law-enforcement function because it was responsible for reviewing charges that a Justice Department attorney "may be

in violation of law, regulations or orders, or of applicable standards of conduct[.]" 28 C.F.R. § 0.39(a) (2001). If OPR's investigation concluded that the attorney's conduct "appear[ed] to involve a violation of law," OPR would refer the matter to the agency with jurisdiction to investigate and bring charges. 28 C.F.R. § 0.39a(d)(1) (2001).

OPR's mission today (and during the time period covered by Bartko's FOIA requests) has narrowed to focus primarily on internal disciplinary matters. Justice Department regulations provide that OPR shall "[r]eceive, review, investigate and refer appropriate allegations of misconduct involving Department attorneys * * *." 28 C.F.R. § 0.39a(a)(1) (2006). Absent from that assignment is any reference to the investigation of criminal wrongdoing or violations of law. That marks a sharp shift in OPR's responsibilities toward the "internal agency monitoring" end of the spectrum, where Exemption 7(C) has no purchase.

"[A] *Glomar* response [i]s inappropriate in the absence of an evidentiary record produced by OPR to support a finding that all OPR records regarding [an] AUSA * * * are law enforcement records." *Jefferson*, 284 F.3d at 179. OPR failed to heed that lesson, offering this court no sufficient basis on which to make the threshold *Glomar* determination that all records (if there are others) concerning allegations of misconduct by Wheeler would have been compiled for law-enforcement purposes.

**2**

OPR also bore the burden of explaining why disclosure of any records would categorically be "reasonably * * * expected to constitute an unwarranted invasion of" Wheeler's personal privacy, when balanced against the public interest in

disclosure. 5 U.S.C. § 552(b)(7)(C). OPR failed that task too.

Much like its vaporous justification for claiming that the requested documents constituted law-enforcement records, OPR just sweepingly asserted that the disclosure of *any* record regarding *any* allegation of misconduct would be an unwarranted invasion of Wheeler's privacy. OPR ignores altogether its obligation to specifically identify the privacy interest at stake, which can vary based on many factors, including frequency, nature, and severity of the allegations. *Cf. American Immigration Lawyers Association v. Executive Office for Immigration Review*, 830 F.3d 667, 675 (D.C. Cir. 2016) (holding, with respect to Exemption 6, that the privacy interest of an immigration judge varied depending on whether the misconduct complaints against her were "substantiated or unsubstantiated," "serious," "trivial," or "repeated[]," and whether she had "been subjected to some type of discipline or ha[d] avoided disciplinary action").

OPR also made no apparent effort to weigh any privacy interest against the countervailing public interest in the disclosure of information concerning allegations of government attorneys' misconduct. OPR cannot issue a blanket proclamation that a loss of privacy would be "unwarranted" without considering whether there is a public interest that might well warrant it. 5 U.S.C. § 552(b)(7)(C). Instead, it must measure the public interest by "the extent to which disclosure [would] advance[] the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny," and "thereby further the citizens' right to be informed about what their government is up to." *American Civil Liberties Union v. Department of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (internal citation and quotation marks omitted). To illustrate, an unsubstantiated allegation that was

dismissed as frivolous might implicate a greater privacy interest or a reduced public interest, while an in-depth investigation that exposed a pattern of abuses across numerous cases would trigger a different balancing of interests. *See Roth*, 642 F.3d at 1180–1182 (finding that the public's "compelling" interest in knowing that a man has not been wrongly sentenced to death outweighed other suspects' privacy interests in not being "link[ed]" to the killings); *cf. American Immigration Lawyers*, 830 F.3d at 675 (noting that "interests on both sides of the * * * balancing test may vary in substantial measure" depending on the individual); *American Civil Liberties Union*, 655 F.3d at 7 (holding that, with respect to disclosing criminal docket numbers and case names, a convicted defendant's privacy interest "is weaker than [that of] individuals who have been acquitted or whose cases have been dismissed").

In short, the *Glomar* response fails for the additional reason that OPR was wholly unable to establish that there would be a single answer to every balancing of interests involving any Wheeler records. That is a yawning omission given the substantial public interest embedded in the Fourth Circuit's finding of a pattern of discovery abuses in the U.S. Attorney's Office for the Eastern District of North Carolina, and that Office's admission that a change in practices was needed and would promptly be made. *See Bartko*, 728 F.3d at 341–343; Gov't's Pet. for Reh'g 2, Docket No. 12-4298; *see also CREW v. Department of Justice*, 854 F.3d 675, 683 (D.C. Cir. 2017) ("Because the myriad of considerations involved in the Exemption 7(C) balance defy rigid compartmentalization, per se rules of nondisclosure based upon the type of document requested, the type of individual involved; or the type of activity inquired into, are generally disfavored."); *see also* Section II.B, *infra*.

That same reasoning dooms OPR's blanket invocation of Exemption 6, 5 U.S.C. § 552(b)(6), as an alternative ground for withholding responsive records. Exemption 6 shields "personnel and medical files and similar files" when their disclosure "would constitute a *clearly unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added). Because Exemption 6 requires an even stronger demonstration of a privacy interest than Exemption 7(C), an agency's inability to justify withholding the latter often precludes it from satisfying Exemption 6's heightened requirements. *See CREW*, 854 F.3d at 681 ("When information is claimed to be exempt from disclosure under both [Exemptions 6 and 7(C)], courts focus on Exemption 7(C) because it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material."); *see also American Civil Liberties Union*, 655 F.3d at 6 (same); *National Archives and Records Admin v. Favish*, 541 U.S. 157, 165–166 (2004) (comparing the two exemptions). We leave open on remand whether OPR can make the required individualized showing needed to invoke Exemption 6 for its non-law-enforcement records.

**B**

Bartko next challenges OPR's decision to withhold specific records that relate to the investigation of Wheeler's handling of Bartko's own case. J.A. 874. Of the 441 pages identified by OPR as responsive to Bartko's request:

- One was released in its entirety;
- Twelve were released in part;
- 102 were withheld entirely;
- Six were referred to the Office of the Inspector General for processing and direct response; and

- 320 were referred to the Executive Office for United States Attorneys for processing and direct response.

OPR asserted Exemptions 5, 6, and 7(C), 5 U.S.C. § 552(b)(5), (b)(6) & (b)(7)(C), to withhold the 114 documents in full or in part. Of those, eight documents that were withheld in full or in part under Exemptions 7(C) and 6 lie at the heart of Bartko's case.

**1**

In attempting to shelter its withholding of the Bartko investigation records under Exemption 7(C), OPR once again dropped the ball. To properly justify its invocation of the Exemption, OPR's affidavit had to offer an explanation that is "full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *Jefferson*, 284 F.3d at 176 (internal quotation marks omitted). For Exemption 7(C), *Jefferson* required OPR to make an individualized showing that each record was actually compiled for law-enforcement purposes rather than internal attorney supervision. *See id*. at 179.

OPR's declaration proved the opposite. OPR explained that most misconduct referrals are closed immediately "with no misconduct findings," or on the written record without a "full investigation, which includes requesting and reviewing relevant documents and conducting interviews of witnesses and the subject attorney." J.A. 879. Even when a full investigation leads to the conclusion that an attorney has engaged in professional misconduct, "those findings could result in a referral to the attorney's state bar or disciplinary action by the Department." J.A. 879.

That description of OPR's review process reveals just how attenuated its "law enforcement" function is. For starters, most matters do not even result in an investigation, making a finding of law-enforcement-triggering misconduct implausible in the vast majority of cases. That summary treatment seems to have been what was accorded to the Fourth Circuit's referral in Wheeler's case because there is no record evidence or attestations from OPR indicating that they interviewed witnesses or requested additional documents for review.

In addition, according to OPR's own explanation, even when misconduct is found, all that usually occurs is a finding of poor judgment or intentional misconduct. Discipline is left to the department head, and perhaps referral to a state bar that would presumably go through its own investigative process (and compile its own records) to determine whether punishment should ensue.

OPR's investigation, in other words, is several steps removed from the type of "adjudicative or enforcement" proceeding or civil sanctions that could warrant Exemption 7(C) protection. *Rural Housing Alliance*, 498 F.2d at 80. That is not nearly enough to trigger Exemption 7(C). In this court, there is "no question that an investigation conducted by a federal agency for the purpose of determining whether to discipline employees for activity which does not constitute a violation of law is not for 'law enforcement purposes' under Exemption 7." *Stern v. FBI*, 737 F.2d 84, 90 (D.C. Cir. 1984).

To be sure, enforcement proceedings need not be imminent for Exemption 7(C) to apply, but they must be "*more than ephemeral possibilities*." *Rural Housing Alliance*, 498 F.2d at 82 n.48 (emphasis added). Even though almost all of its complaints are closed without a full investigation, much less an adverse finding, OPR argues that all of its Wheeler records

qualify as law-enforcement records just because of the slight chance that an inquiry could lead to an investigation that could lead to a misconduct finding that could result in a state bar referral that could lead to a bar sanctions hearing. That claim does not rise above the ephemeral.

This case highlights OPR's exaggerated reliance on Exemption 7(C). In August 2014—just days after the Fourth Circuit issued its opinion reprimanding the U.S. Attorney's Office for the Eastern District—OPR wrote an initial memorandum documenting the court's referral. In that memorandum, before any investigation had begun or findings had been made, OPR concluded that, "[b]ecause former AUSA Wheeler is no longer employed by the Department, and because further investigation of AUSA Bragdon is *unlikely* to result in a finding of misconduct, *it is questionable whether this matter warrants further inquiry*." J.A. 893 (emphases added). So right out of the gate, OPR did not find that the Fourth Circuit's referral was substantial enough to inquire further; OPR did not even think Wheeler's actions warranted a low-level inquiry. Nor does OPR explain what type of investigation it conducted, what violations of law it was investigating, or whether there was ever more than a fleeting possibility of civil sanctions. That is not an investigation with an eye toward law-enforcement proceedings.

**2**

On top of that, the balance between Wheeler's interest in privacy and the public's interest in how OPR handled a federal appeals court's concerns about possible prosecutorial misconduct weighs strongly in favor of disclosure.

On the privacy side of the balance, Wheeler's interest is substantially diminished. First, the allegations of misconduct

during the Bartko trial are already a matter of public record, as is the referral to OPR published in the Fourth Circuit's decision, and the U.S. Attorney's public announcement that it too was referring the allegations of misconduct to OPR. *See Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 n.15 (1989) ("[T]he interests in privacy fade when the information involved already appears on the public record.") (quoting *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494–495 (1975)). Any interest Wheeler might have had in keeping his name in the free-and-clear has already largely evaporated. *See Kimberlin v. Department of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998) ("[The AUSA's] statement to the press undoubtedly does diminish his interest in privacy: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction.").

Also, unlike the lower-level staff attorneys whose records were at issue in *Jefferson* and *Kimberlin*, AUSA Wheeler was a supervisory official in the U.S. Attorney's Office. At the time of Bartko's prosecution and the allegations of prosecutorial misconduct, Wheeler was the Chief of the Economic Crimes Section in the U.S. Attorney's Office. That supervisory responsibility comes with an increased public interest in how prosecutorial policies and priorities were both set and implemented by Wheeler and the individuals under his direction. *Cf. Stern*, 737 F.2d at 93–94 (noting that a senior FBI official had less of a privacy interest than lower level employees under his supervision who might have simply been following orders).

On the other side of the scale, the public interest in knowing what OPR did weighs heavily. FOIA, at its core, operates on the assumption that "it is for the public to know and then to judge." *Stern*, 737 F.2d at 94. The public has an interest in knowing "that a government investigation itself is

comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner." *Id.* at 92. That is how FOIA helps "to hold the governors accountable to the governed." *Id.*

That interest crescendos when the misfeasance of a federal prosecutor with "the power to employ the full machinery of the state in scrutinizing any given individual" is at stake. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987). The public "must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice." *Id.*

The significant public interest in this case is corroborated by the decision of the U.S. Attorney's Office to overhaul its discovery and disclosure practices in response to the Fourth Circuit's decision. Indeed, the U.S. Attorney's Office "admit[ted]" its failures and imposed more stringent discovery review and disclosure policies on its attorneys. Gov't's Pet. for Reh'g 3, *Bartko*, No. 12-4298 (4th Cir. Sept. 6, 2013), ECF No. 105. Such "[m]atters of substantive law enforcement policy," and the events that set them in motion, "are properly the subject of public concern," *American Civil Liberties Union*, 655 F.3d at 14 (quoting *Reporters Comm.*, 489 U.S. at 766 n.18). There is also a corresponding public interest in knowing if the government's remedial measures adequately redressed the harm that prompted the policy changes. *See CREW*, 854 F.3d at 679 ("[There is a] weighty public interest in shining a light on the FBI's investigation of major political corruption and the [Department of Justice]'s ultimate decision not to prosecute," which the court explained was "not to find out what the [accused] himself was 'up to' but rather how the FBI and [Department of Justice] carried out their respective

statutory duties[.]") (internal citation and quotation marks omitted).

Finally, because the public interest substantially outweighs any residual privacy interest Wheeler might retain with respect to his conduct in the Bartko case, OPR's reliance on Exemption 6's even more demanding standard fails as well. *See* Section II.A.2, *supra.*

**3**

While OPR erred in withholding eight records under Exemptions 6 and 7(C), the remainder of the documents that Bartko seeks concerning the investigation into his prosecution were properly withheld under Exemption 5, 5 U.S.C. § 552(b)(5). That Exemption insulates from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Id.* Exemption 5 is most commonly invoked to protect the deliberative-process privilege, the attorney work-product privilege, and the attorney-client privilege. *See Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). Our *in camera* review confirms the district court's ruling that Exemption 5 was properly applied to protect OPR's deliberative, pre-decisional process and its discussion of matters related purely to the pending FOIA litigation.

**C**

Bartko also challenges the invocation of Exemption 7(C) by the FBI, the U.S. Postal Inspection Service, the Securities

and Exchange Commission, the Executive Office for U.S. Attorneys, and the Internal Revenue Service.

As to the FBI and Postal Inspection Service, the nature of their law-enforcement roles, the types of records requested, and the balance of interests involved together support the claimed Exemption.

As a preliminary matter, unlike OPR's documents, the FBI's and Postal Inspection Service's records were compiled for law-enforcement purposes as they were collected during an investigation that "focus[ed] directly on" Bartko's "specifically alleged" criminal activities. *See, e.g.*, *Bartko v. Department of Justice*, 2015 WL 9272833, at \*5 (D.D.C. Dec. 18, 2015) ("[I]t is undisputed that the records in question were created for law-enforcement purposes[:] Plaintiff's investigative main file was compiled by the FBI during its criminal investigation of plaintiff and others for the crimes of conspiracy to commit mail fraud, the sale of unregistered securities and money laundering, and engaging in unlawful monetary transactions.") (internal quotation marks omitted); *Bartko v. Department of Justice*, 167 F. Supp. 3d 55, 67 (D.D.C. 2016) ("Bartko concedes that the [Postal Inspection Service] records he wants were compiled for law-enforcement purposes.").

Unlike OPR's, the FBI's application of Exemption 7(C) was measured and carefully calibrated to balance the competing private and public interests. In response to Bartko's request for records about his purported co-conspirators, the FBI processed 1,233 pages, released 1,099 pages to Bartko in full or in part, and withheld 134 pages. *Bartko*, 2015 WL 9272833, at \*1. The FBI identified eight categories of names and identifying information that it withheld pursuant to the Exemption: (1) FBI special agents

and support employees; (2) third parties of investigative interest; (3) non-FBI federal-governmental personnel; (4) third parties merely mentioned; (5) recipients of subpoenas; (6) third-party victims; (7) third parties who provided information to the FBI; and (8) state law-enforcement employees. *Id.* at *5.

As this Court has held, "third parties," "witnesses," and "informants" mentioned in investigatory files maintain a privacy interest "in keeping secret the fact that they were subjects of a law enforcement investigation." *Nation Magazine v. United States Customs Service*, 71 F.3d 885, 894 (D.C. Cir. 1995); *see also Martin v. Department of Justice*, 488 F.3d 446, 457 (D.C. Cir. 2007) ("We also note that privacy interests are particularly difficult to overcome when law enforcement information regarding third parties is implicated."). For that reason, the FBI is permitted "to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker v. Department of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)).

That privacy protection also extends to law-enforcement personnel who "do[] not forgo altogether any privacy claim in matters related to official business." *Lesar v. Department of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980); *see also Kimberlin*, 139 F.3d at 949. The district court's *in camera* review confirmed the FBI's precise approach to only redacting information implicating those recognized privacy interests, and approved its reasonable segregation of all disclosable material. *Bartko*, 2015 WL 9272833, at *7. Given the FBI's individualized justification for each category of withheld material, the district court's *in camera* review, and Bartko's

failure to explain how disclosure would serve the public interest, we affirm the withholding of documents on those grounds.

Bartko launches the same attack against the Postal Inspection Service's invocation of Exemption 7(C), arguing that the public interest mandates disclosure in spite of any third-party privacy interests.   In this particular request, Bartko sought records "contained in the files of [the Postal Inspection Service] and specifically under [Bartko's] name and/or identifier assigned to [Bartko's] name," such as arrest records and investigation reports.    J.A. 343.    As previously discussed, third parties retain a privacy interest in not being associated with an investigation.    And the district court's review of the documents confirmed that the withheld records did "not contain any information that appeared to reflect prosecutorial or agency misconduct," *Bartko*, 167 F. Supp. 3d at 70, so the public interest in disclosure cannot overcome the privacy interests at stake.   *See Favish*, 541 U.S. at 172 ("[T]he citizen must show that the public interest sought to be advanced is a significant one * * * [and] must show the information is likely to advance that interest.   Otherwise, the invasion of privacy is unwarranted.").

Bartko conclusorily asserts that the IRS's and the Commission's application of Exemption 7(C) was improper, but he fails to offer any specific arguments as to why.[3]   *See*

_____

[3] Bartko also challenges the Executive Office of U.S. Attorneys' invocation of Exemption 7(C), but none of the district court orders or judgments under review approve of that Office's application of Exemption 7(C).   *See generally Bartko v. Department of Justice*, 2014 WL 12787640 (D.D.C. Sept. 9, 2014); Order, *Bartko v. Department of Justice*, No. 13-cv-1135 (D.D.C. Dec. 11, 2014); *Bartko v. Department of Justice*, 102 F. Supp. 3d 342 (D.D.C. 2014).   Nor does Bartko identify what ruling he contests.

Bartko Br. 9 ("Bartko asserts on appeal that the strength of the public's interest in access to the withheld records outweighs the claims asserted by the six Defendant-Agencies that relied upon Exemption (b)(7)(C) to withhold records and information."); *id.* at 22 ("The District Court erred in upholding the IRS claim of exemption."); *id.* at 28 ("[T]he claim of the (b)(7)(C) exemption by the [Postal Inspection Service], as well as the other Defendant-Agencies (including the 136 pages withheld by the IRS), fails and this Court should so hold."). As to those agencies, Bartko neither specifies the portions of the district court's analyses that he challenges nor the alleged errors in the agencies' justifications for the claimed exemption.

As best we can tell, the gist of Bartko's argument seems to be that the public interest involved overrides any potential privacy interest at stake. But as *Favish* held, it is Bartko's burden to show, for each set of records he seeks (which varied greatly from agency to agency), that "the public interest sought to be advanced is a significant one," and that "the [requested] information is likely to advance that interest." 541 U.S. at 172; *see Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way.") (internal quotation omitted). Because Bartko has failed to do so, this Court affirms the district court's decisions regarding the IRS's and the Commission's invocation of Exemption 7(C).

---

Therefore, the Court will not address this undeveloped objection. *Cf. Goos v. National Ass'n of Relators*, 997 F.2d 1565, 1572 (D.C. Cir. 1993) (refusing to consider a "twice-speculative" claim with an "uncertain foundation" because "this court tries not to base its decisions on mind reading").

**III**

One of Bartko's remaining objections to the agencies' searches warrants further attention by the district court, while the rest are without merit.

**A**

Bartko seeks the disclosure of a "thumb drive" that "was produced in response to a Grand Jury Subpoena to a third party individual" and contained "specific documents sought by the Grand Jury."   J.A. 952.

FOIA Exemption 3 allows the government to withhold records that are "specifically exempted from disclosure by [another] statute[.]"   5 U.S.C. § 552(b)(3).   A common example of a qualifying Exemption 3 statute is Federal Rule of Criminal Procedure 6(e), which bars disclosure of "a matter occurring before the grand jury."   FED. R. CRIM. P. 6(e)(2)(B). Specifically, Rule 6(e) protects information that would "tend to reveal some secret aspect of the grand jury's investigation, including the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, or the deliberations or questions of jurors." *Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) (citation and internal quotation marks omitted).   Rule 6(e) does not, however, "draw 'a veil of secrecy * * * over all matters occurring in the world that happen to be investigated by a grand jury.'" *Labow v. Department of Justice*, 831 F.3d 523, 529 (D.C. Cir. 2016) (alteration in original) (citation omitted).

Invoking Exemption 3's protection of grand jury materials, the FBI withheld the thumb drive from disclosure. Because the only information contained on the thumb drive was obtained in response to a grand jury subpoena, the FBI

asserted that "[a]ny disclosure of the information * * * would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury[.]" J.A. 953.

With commendable due diligence, the district court reviewed the records at issue *in camera* and agreed that withholding was proper on the ground that the thumb drive "contain[ed] information about the names of recipients of federal grand-jury subpoenas; information that identifie[d] specific records subpoenaed by a federal grand jury; and copies of specific records provided to a federal grand jury in response to such a subpoena." *Bartko*, 2015 WL 9272833, at *4. On all points but the last, we agree.

In the time between the district court's decision and this appeal, this court clarified that documents that "would reveal to the requester that they had been subpoenaed" by a grand jury would be protected, but documents that "would not necessarily reveal a connection to a grand jury" would not. *Labow*, 831 F.3d at 529. The record before us does not answer whether the documents on the thumb drive themselves "would have revealed something about the workings of the grand jury had they been released with other requested documents," and thus we cannot say that they would have been identifiable as materials sought by the grand jury. *Id.* at 530.

As recognized by *Labow*, "it may turn out, in this case, that most, or even all, of the material withheld pursuant to [Exemption 3] cannot be disclosed without compromising the secrecy of a grand jury's deliberations," but "[t]he mere fact the documents were subpoenaed fails to justify withholding under Rule 6(e)." *Id.* For that reason, we remand to the district court for further consideration in light of our intervening decision in *Labow*.

**B**

Bartko next faults the Securities and Exchange Commission for conducting an inadequate search and for improperly applying Exemptions 5 and 8 to withhold or redact records. He fails to persuade on all three challenges.

As to the adequacy of the Commission's search, Bartko argues that it failed to search a supposed "third file" that purportedly contained information about the Capstone Fund. The problem for Bartko is that there is no discernible evidence in the record that any such third file exists. The Commission explained that, in searching for responsive documents, it had used all of the names listed in the FOIA request as search criteria and searched its Name Recognition Search Index. That identified two (not three) relevant investigative "matters" with responsive records. J.A. 540. As the district court found, there is "no evidence * * * that the [Commission's] Atlanta Regional Office even had a file on Capstone Partners during the relevant time period," and Bartko did not provide an "appropriate alternative approach to the search" that might uncover what he seeks. *Bartko v. Department of Justice*, 2016 WL 4506968, at *6 (D.D.C. Aug. 26, 2016).

Bartko's continued speculation that a third file exists is not enough to undermine the adequacy of the Commission's search. "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc.*, 926 F.2d at 1200 (citation omitted). Nor does the failure of a search to uncover a particular sought-after document evidence the search's insufficiency. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) ("[I]t is long settled that the

failure of an agency to turn up one specific document in its search does not alone render a search inadequate.").

Bartko also takes issue with the Commission's reliance on Exemption 8 to withhold two documents. Exemption 8 allows agencies to hold back material that is "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8). Bartko argues that the Caledonian and Capstone Funds that he managed and that were investigated by the Commission are not "financial institutions" regulated by the Commission, and thus do not fall within Exemption 8.

Bartko's argument fails before it even starts. He did not challenge the Commission's reliance on Exemption 8 in the district court. J.A. 583 (acknowledging that the Commission's "withholding of document 36 and 38 is understandable"). So he has forfeited the challenge. *See Chichakli v. Tillerson*, 882 F.3d 229, 234 (D.C. Cir. 2018) ("But [the appellant] failed to raise this argument below, and therefore it is forfeited."). And there is no reason for us to exercise our discretion to reach the question given that both withheld documents—a report of an examination of a broker-dealer, pursuant to 15 U.S.C. § 78q(b), and a letter relating to that report—fall within Exemption 8's heartland.

Lastly, Bartko contends that Exemption 5's attorney work-product privilege cannot apply because Commission staff "engaged in investigatory misconduct" when working with Bartko's criminal prosecution team. Bartko Br. 43. But the case on which Bartko relies, *Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981), involved a different situation in which the attorney admitted to "unprofessional conduct," and, in providing guidance to the district court on remand, this court stated that

only "tainted work product" resulting from that misconduct "need be released." *Id.* at 800 n.17, 801 n.20. Unlike in *Moody*, the Commission has admitted to no impropriety here, Bartko has offered no evidence of misconduct, and there is no evidence that the records sought by Bartko were the result of any alleged wrongdoing.

**IV**

Lastly, Bartko challenges the Executive Office for U.S. Attorneys' charge of a fee for processing his FOIA request. Citing its policy that the first 101 pages of released records are free, while the remaining 519 pages come at a cost, the Executive Office required Bartko to pay a $51.90 processing fee before releasing the material to him. Bartko is correct: he should not have been charged that fee.

When, as here, records are not requested for commercial use, an agency may only charge reasonable fees "for document search and duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(III). And FOIA directs that the fee be waived "if disclosure of the information is [i] in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and [ii] is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii). "[F]ee-waiver applications are to be 'liberally construed' in favor of * * * requesters." *National Sec. Counselors v. Department of Justice*, 848 F.3d 467, 473 (D.C. Cir. 2017).

The parties agree in this case that Bartko satisfies the second prong because the information sought does not serve any personal commercial interest. *Bartko v. Department of Justice*, 102 F. Supp. 2d 342, 350 (D.D.C. 2015) ("EUOSA

concedes that disclosure is *not* primarily in Bartko's commercial interest[.]").

With respect to the first prong, Bartko is entitled to a fee waiver if he shows in "reasonably specific" and "non-conclusory terms" that the disclosed records would contribute to public understanding of the government's activities. *National Sec. Counselors*, 848 F.3d at 473. Measuring the contribution to public understanding turns upon "the degree to which 'understanding' of government activities will be advanced by seeing the information; and the extent of the 'public' that the information is likely to reach." *Cause of Action v. FTC*, 799 F.3d 1108, 1116 (D.C. Cir. 2015). "FOIA does not require [however] that a requester be able to reach a 'wide audience,'" just a "reasonably broad audience of persons interested in the subject." *Id.*

Bartko's request satisfies those criteria. He explained in some detail how the requested records would contribute to public understanding. The information, he reasoned, was needed to "follow-up on the government's actions and/or inaction" in light of the Fourth Circuit's spotlight on the "serious discovery abuses by federal prosecutors in [the Eastern District of North Carolina]." J.A. 678. In that sense, disclosure was "likely to contribute significantly to the public's understanding of how federal prosecutors endeavor to secure convictions by sidestepping important constitutional protections for the accused," and "how the [criminal justice] system functions in reality compared to how the system was intended to function." J.A. 678–679.

Bartko was also uniquely positioned to convey this information because his prosecution had already garnered "significant media interest," and he was able to add a personal element by describing the damage that the "misconduct and

improprieties of federal prosecutors" can have on individual citizens. J.A. 678. Indeed, he identified three public service websites with which he had already shared information and attached an article that had been written about the prosecutorial errors in his case. That explanation demonstrated in reasonably specific and non-conclusory terms why his FOIA request mattered, and how the records in question could shed light on matters already identified by the Fourth Circuit as important to the integrity of the criminal justice system.

The district court acknowledged that there were "public interest benefits to be gained," but concluded that "they [we]re minimal in comparison to the unavoidably obvious personal purpose for which the records [we]re sought"—that is, bolstering Bartko's habeas corpus effort. *Bartko*, 102 F. Supp. 3d at 351. That was legal error. FOIA states that a fee waiver is available as long as disclosure "is not primarily in the *commercial* interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii) (emphasis added). No party contends that the release of records would be in Bartko's financial interest. Beyond that, it does "no[t] * * * matter[] whether the information will also (or even *primarily*) benefit the requester." *Cause of Action*, 799 F.3d at 1118 (emphasis added). "Nor does it matter whether the requester made the request for the purpose of benefiting itself." *Id.* All that matters is whether these records are likely to significantly contribute to public understanding. *See id.*

In short, the public interest in the material Bartko seeks is substantial given the Fourth Circuit's disclosure of a troubling pattern of prosecutorial missteps and the U.S. Attorney's Office's recognition that errors had been made and changes would be implemented. Disclosure will reveal what is yet unknown—how the government handled the misconduct allegations internally and how it responded to the significant

concerns expressed by the Fourth Circuit. Bartko, for his part, is sharing the information with an interested public. Since there is no claim that Bartko has a commercial interest in the documents, and the material is in the public's interest, he qualified for a fee waiver.[4]

\* \* \* \* \*

For the foregoing reasons, we reverse the district court's award of summary judgment with respect to (i) OPR's use of Exemption 7(C) to justify its *Glomar* response and other withheld records, and (ii) its denial of Bartko's fee waiver request. The court will also remand for the district court to reconsider its decision regarding the FBI's withholding pursuant to Exemption 3 and Criminal Rule of Procedure 6.

*So ordered.*

---

[4] The court leaves to the district court to determine, if and when appropriate, how this decision impacts Bartko's challenge to the Executive Office's advance search-fee charge for FOIA request 2014-00486.