# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued November 17, 2023        Decided May 28, 2024

No. 23-7012

DAVID W. NOBLE, JR.,
APPELLANT

v.

NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO, ET
AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01613)

---

*Daniel F. Olejko* argued the cause and filed the briefs for
appellant.

*Peter DeChiara* argued the cause and filed the brief for
appellees. *Kate M. Swearengen* entered an appearance.

Before: HENDERSON and CHILDS, *Circuit Judges,* and
EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Concurring opinion filed by *Senior Circuit Judge*
EDWARDS.

2

Dissenting opinion filed by *Circuit Judge* HENDERSON.

CHILDS, *Circuit Judge*: The National Association of Letter Carriers ("NALC" or "the Union") is a national labor organization and the exclusive bargaining agent for 280,000 active and retired city letter carriers employed by the United States Postal Service ("the USPS"). NALC holds officer elections every four years. Since NALC's founding in 1889, only one challenger has ever defeated an incumbent president. The most recent election was held in October 2022, and the dispute here arises out of events leading up to that election.

Appellant David W. Noble, Jr. ("Noble") was a candidate for president in NALC's October 2022 election, running on a platform to "rid the union of an incompetent and corrupt leadership." JA000024. As part of his campaign, he sought to publish his campaign material in the February 2022 edition of NALC's magazine, the *Postal Record*. The *Postal Record* is mailed to every NALC member and may be viewed at any time on the NALC website. It is owned in equal shares by the Union membership. The magazine contains content such as messages from the president and other NALC officers, updates on the USPS Board of Governors, human interest pieces about NALC members, information about USPS-NALC agreements, and an in-memoriam section.

NALC allows officer candidates to place paid campaign advertisements in the *Postal Record*'s designated election issue. NALC denied Noble's request to publish his campaign ads in multiple editions of the *Postal Record* pursuant to this internal policy. Noble sued NALC, asserting that the Union was required to publish his campaign material under Section 401(c) of the Labor-Management Reporting and Disclosure Act ("the LMRDA"). 73 Stat. 532, 29 U.S.C. § 481. NALC moved to dismiss the complaint for failure to state a claim on

which relief can be granted, and the district court granted NALC's motion. On appeal, Noble argues that the district court's dismissal was based on an overly narrow interpretation of the LMRDA's Section 401(c). NALC not only responds that the district court's interpretation of the LMRDA was appropriate, but also that compelling the Union to publish campaign literature in *any* issue of the *Postal Record*, as opposed to just the dedicated campaign issue, would violate the First Amendment.

We hold that dismissal was premature because the district court failed to make sufficient findings to determine the reasonableness of Noble's request under the balancing of hardships required by *International Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466 (1991). We further hold that NALC, as a non-media organization, does not have a free speech right to decline to print a campaign advertisement in the *Postal Record*, as it is merely hosting the speech in its magazine and is not accompanying the advertisement with speech of its own. We reverse and remand for further consideration of Noble's complaint.

## I.

Noble was hired by the USPS in 1975 and joined NALC shortly thereafter. He was an officer candidate in the Union's 2022 election. The September/October issue of the *Postal Record* was the designated election issue for the 2022 officer election. In December 2021, Noble emailed NALC president Fredric Rolando, inquiring about the publication rates and the deadline to submit his campaign material for publication, starting with the February 2022 edition of the magazine. NALC denied his request in keeping with internal union policy which only allows political advertisements to be run in the *Postal Record*'s designated election issue.

4

Noble brought the present lawsuit pro se in the district court, alleging that the Union violated the LMRDA's Section 401(c) by refusing to distribute his campaign material, seeking declaratory judgment and an injunction requiring NALC to publish his campaign material. Section 401(c) governs unions' responsibilities regarding union election campaign material. It requires that labor organizations:

> shall be under a duty, enforceable at the suit of any bona fide candidate for office in such a labor organization … to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization.

29 U.S.C. § 481(c). [1] NALC moved to dismiss Noble's complaint, arguing that Noble failed to state a claim under

---

[1] Section 401(c) of the LMRDA provides:

> Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or

Federal Rule of Civil Procedure 12(b)(6) because Section 401(c) did not *require* NALC to publish Noble's campaign advertisement in the *Postal Record.* The district court agreed. In interpreting the statute, the district court concluded that Section 401(c) does not require a union to publish a candidate's campaign advertisements, but instead only requires that a union coordinate the delivery of a candidate's standalone, already-printed campaign material to its membership. The district court also concluded that Noble's request was unreasonable because the statute does not give union members "license to alter the nature of the *Postal Record* by requiring it to print advertising and campaign material it otherwise would not." *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 2022 WL 17613057, at *6 (D.D.C. Dec. 13, 2022). Noble now appeals.

---

otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

29 U.S.C. § 481(c).

The district court had federal question jurisdiction to hear Noble's claims under 29 U.S.C. § 481(c) and 28 U.S.C. § 1331. We have jurisdiction to review the district court's final order dismissing Noble's complaint under 28 U.S.C. § 1291. We review the district court's interpretation of the LMRDA *de novo*. *Noble v. Dunn*, 895 F.3d 807, 810 (D.C. Cir. 2018).

**II.**

Because his issue on appeal is one of statutory interpretation, we first analyze whether Noble's request to publish his ad in the *Postal Record* falls within LMRDA Section 401(c). Section 401(c) mandates that unions "distribute" any candidate's campaign material. NALC argues that "distribute" is distinct from "publish," because publishing is expressive conduct while distributing is not. We disagree.

"In addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). The text must be read in the context of the entire statute. *Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020); *Petit v. U.S. Dept. of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012). After examining the plain text, we move on to the statute's structure, purpose, and legislative history. *Genus Med. Techs., LLC v. FDA*, 994 F.3d 631, 641 (D.C. Cir. 2021). However, we need not address legislative history if "after analyzing the text, structure and context, we conclude that the language is unambiguous." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 338–39 (D.C. Cir. 2020).

The relevant statutory text in this case is Section 401(c), which provides that labor organizations:

shall be under a duty, enforceable at the suit of any bona fide candidate for office in such a labor organization … to comply with *all reasonable* requests of any candidate to *distribute* by mail *or otherwise* at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization.

29 U.S.C. § 481(c) (emphasis added). While our Circuit has said that "the very essence of publishing is making the decision whether to print or retract a given piece of content," *Klayman v. Zukerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014), we have also held that posting content is synonymous with distributing content, *Cause of Action v. FTC*, 799 F.3d 1108, 1123 (D.C. Cir. 2015) (clarifying that posting qualifies as publishing even if readers have to "affirmatively access" the content as opposed to having it "delivered to their doorsteps or beamed into their homes"); *see also Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1386 (D.C. Cir. 1989) ("intended distribution of [the] document [] entails the kind of initiative we associate with 'publishing or otherwise disseminating' that information.") Because our Circuit views "distribute" and "publish" as synonymous, Noble's request that NALC "publish" his advertisement falls within the text of the statute.

NALC also argues that the words "or otherwise" in Section 401(c) refer to non-mail methods of distribution, not publication of campaign materials. The Union relies on a non-precedential district court decision, *Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37 (D.D.C. 2013), to support its argument. We find that the Union's reliance on the decision is misplaced. In *Dimondstein*, the district court held that a candidate's request to distribute campaign materials via email was reasonable, explaining that "a union must still abide

by reasonable candidate requests to use alternative forms of distribution . . . if the union uses these alternative forms to disseminate information to its members." *Id.* at 43. Here, NALC regularly uses the *Postal Record* to disseminate information to its members – it published eleven volumes in 2022, and there are *Postal Record* archives dating back to 2010. Moreover, the words "or otherwise" indicate that courts should broadly interpret the statute. *United States v. Fischer*, 64 F.4th 329, 338 (D.C. Cir. 2023). First, the use of "or" is a strong indication that Congress intended alternative choices. *See Loving v. IRA*, 742 F.3d 1013, 1019 (D.C. Cir. 2019); *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 80 (2018) (""[O]r' is almost always disjunctive.") (cleaned up). Second, "otherwise" indicates that the statutory provision reaches beyond the specific examples listed in the statutory text, making the provision a catch-all provision. *Fischer*, 64 F.4th at 338; *United States v. Bingert*, 605 F. Supp. 3d 111, 125 (D.D.C. 2022) (citation omitted). Therefore, "or otherwise" should include publication of campaign literature in a union magazine. The district court's conclusion that a union is only required to coordinate the delivery of a candidate's standalone, already-printed campaign materials renders "or otherwise" superfluous. We must reject this narrow interpretation because we presume that Congress would not include empty words in the statutory provision. *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018). Our reading of "or otherwise" further supports that Noble's claim falls within Section 401(c)'s statutory text.

We next find that Noble's request is supported by the LMRDA's structure and purpose. *Genus Med. Techs.*, 994 F.3d at 641. In *Brown*, the Supreme Court noted that other rights that the LMRDA confers onto union members are qualified. For example, a member's right to run for union office is "made expressly subject to the 'reasonable

qualifications uniformly imposed' by the Union"; and a member's right to speech and to vote in the election are governed by other LMRDA sections and "'subject to reasonable rules' in the union's constitution." *Brown*, 498 U.S. at 475–76 . On the other hand, Section 401(c) is not cabined by other statutory provisions or union policies. Therefore, the Supreme Court has deemed the 401(c) right as "unqualified." *Id.* at 476.

The dissent offers the view that the LMRDA's legislative history supports the district court's interpretation of Section 401(c). We disagree. In *Brown*, the Court clarified that "[a] broad interpretation of the candidate's rights is also consistent with the statute's basic purpose of ensuring free and democratic union elections by offsetting the inherent advantage incumbent leadership has over potential rank and file challengers." *Id.* at 467. The Court further recognized testimony in support of the LMRDA highlighting that in a union election, an incumbent enjoys certain advantages regarding the "union newspaper which is the chief vehicle for communication with its members." *Id.* at 476. The dissent argues that because Section 401(c) is the manifested compromise between House and Senate proposals on the issue of candidates accessing their union's membership list, our reading of the statute extends NALC's duty beyond the statutory text. We disagree that an obligation to grant a member's reasonable request to disseminate their campaign literature via the union publication runs the risk of a union losing control over its membership list because a union does not need to give the candidate its membership list to grant the candidate's request. Furthermore, Noble's appeal does not implicate this issue, raised solely by the dissent. Here, NALC is not objecting to whether the material can be included, but instead it is seeking to control which editions of the *Postal Record* can include campaign material.

In sum, traditional canons of statutory construction and Supreme Court precedent support that Noble's claim falls within Section 401(c).

**III.**

Having determined that Noble's request falls within LMRDA Section 401(c), we now turn to whether that request was reasonable. We hold that the district court misapplied the reasonableness standard by inquiring whether NALC's internal policy was reasonable instead of whether Noble's request was reasonable.

The seminal case for Section 401(c) interpretation is *International Organization of Masters, Mates & Pilots v. Brown*, where a candidate sought his union's mailing list to mail his campaign literature in advance of the upcoming union nomination convention. 498 U.S. at 469. The union denied his request because an internal union rule prohibited such preconvention mailing. *Id.* at 467–68. The Supreme Court squarely held that Section 401(c) does *not* require a court to evaluate the reasonableness of a union's rule before determining the reasonableness of a candidate's request: "apart from the fact that [the candidate's] request violated the union rule against preconvention mailings, there is no basis for contending that the request was not 'reasonable' within the meaning of [Section 401(c)]." *Brown*, 498 U.S. at 475. The Court also placed the burden on the union to show that a candidate's request is unreasonable. *Id.* at 478. Here, *Brown* makes clear that Noble's request cannot be held unreasonable solely because it conflicted with NALC's internal rule. Noble sought to publish his campaign material prior to the September/October issue of the *Postal Record* just as the candidate in *Brown* wanted to distribute campaign material before the designated distribution period. *Id.* at 467–68. A

union's argument that a candidate's request is *per se* unreasonable simply because it conflicts with their internal rule is "unpersuasive." *Id.* at 478. Accordingly, NALC cannot rest its case on internal policies because "expressions of respect for internal union rules are notably absent in § 401(c)." *Id.* When evaluating a union's argument that a candidate's request is unreasonable, courts should instead consider factors such as any financial hardship suffered by the union, any administrative burden imposed on the union, and any discrimination against other candidates. *Id.* The district court failed to make sufficient findings to determine reasonableness *vel non* of Noble's request under the balancing of hardships required by *Brown*. Dismissal was therefore premature.

## IV.

In the alternative, NALC argues that requiring it to publish Noble's campaign material would run afoul of the First Amendment's prohibition on compelled speech. Though the Union presented this argument below, the district court did not consider whether interpreting Section 401(c) to require publication of Noble's campaign advertisements would violate the First Amendment. We find that requiring publication of Noble's campaign material, at his own financial expense, would not constitute compelled speech in violation of the First Amendment.

NALC primarily relies on cases involving newspaper regulation to support its First Amendment argument. *See Passaic Daily News v. N.L.R.B.*, 736 F.2d 1543, 1558 (D.C. Cir. 1984); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). While "laws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State'" and are thereby "always subject

to at least some degree of heightened First Amendment scrutiny," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640–41 (1994), the same is not true for union publications because unions are not news organizations.[2]   Therefore, we should turn to precedent on First Amendment protections for non-media entities, that do not enjoy heightened scrutiny, to guide our analysis of NALC's First Amendment defense.

Other cases illustrate that when a non-media organization hosts content, the content is not considered to be theirs *unless* a reasonable observer would attribute the content back to the organization.   For example, in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* ("*FAIR*"), the Supreme Court explained that "[t]he expressive component of [an entity's] actions is not created by the conduct itself but by the speech that accompanies it."   547 U.S. 47, 66 (2006); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 580 (2023) (holding that because the plaintiff *created* wedding websites, the state law that would force her to *create* speech she did not believe in violated the First Amendment.)

Here, Noble is only asking NALC to host his own speech. NALC is not speaking when it publishes member-candidates' campaign literature created by the member.   Furthermore, publishing this literature does not "sufficiently interfere" with NALC's message.   *FAIR*, 547 U.S. at 64.   NALC cannot assert a First Amendment injury because it is merely facilitating union elections by publishing candidate campaign literature.

---

[2]   In fact, the Supreme Court has allowed government regulation of unions, even when First Amendment values are at stake.  *See, e.g.*, *Brown*, 498 U.S. at 471 (affirming district court decision requiring union to disclose membership lists. The Court did not consider mandatory disclosure to qualify as compelled speech.).

NALC cites *Pacific Gas. & Electric Co. v. Public Utilities Commission of California* to show that even non-media entities have constitutional rights to not publish third-party content. 475 U.S. 1 (1986) (holding that compelling a private corporation to provide a forum for views other than its own infringes its freedom of speech). Pacific Gas had distributed a newsletter in its monthly billing envelope to customers. The newsletter "included political editorials, feature stories on matters of public interest, tips on energy conservation, and straightforward information about utility services and bills." *Id.* at 5. A state commission allowed a third-party to disseminate materials in the newsletter, and the Supreme Court found that "[c]ompelled access like that ordered in this case both penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda they do not set." *Id.* at 9; *see also Forum for Acad.& Institutional Rts. v. Rumsfeld*, 390 F.3d 219, 236 (3d Cir. 2004) (stating that *Pacific Gas* stands for the proposition that "government action that forces a private speaker to accommodate or include another private speaker's message" is impermissible compelled speech). Noble's case is entirely distinguishable from *Pacific Gas* because several factors make it less likely that a reasonable observer would attribute Noble's campaign advertisement to the Union's agenda. In *Pacific Gas*, the corporation was forced to publish the third-party entity's content in the newsletter distributed to Pacific Gas customers. Meanwhile, Noble is a union member, seeking to publish an advertisement for his candidacy in the union's leadership, in the union's internal publication (a publication that is owned in equal shares by union membership, including Noble). NALC opens the *Postal Record* for campaign advertisements in certain issues, and members can place mutual transfer advertisements in any issue. Considering these relevant distinctions, a reasonable reader of the *Postal*

*Record* would not take the publication of a candidate's campaign material in the union magazine as the NALC's endorsement of the candidate's message.

*****

For the foregoing reasons, we reverse the district court's dismissal of Noble's claim against NALC and remand for further proceedings consistent with this opinion.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, concurring: To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Noble's complaint easily satisfies this standard. Indeed, I am "hard-pressed to imagine what more [Noble] need[ed] to allege to satisfy the 'lesser showing required at the pleading stage,' particularly in light of the kind of claim [he] brings." *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 343 (D.C. Cir. 2018) (quoting *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,* 659 F.3d 13, 18 (D.C. Cir. 2011)).

Noble plausibly claims that he has a right under the Labor-Management Reporting and Disclosure Act ("LMRDA") to seek distribution of his campaign materials through his Union's publication. Indeed, the Supreme Court has confirmed that "Labor unions have a statutory duty to distribute campaign literature to their membership in response to the reasonable request of any candidate for union office*." Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 467 (1991). A union may deny a candidate's distribution request if it is not reasonable. However, as the Court has made clear, a union member's request is not "*per se* unreasonable simply because it conflicts with a union rule." *Id*. at 478. Rather, the union carries the burden to show that a member's request is unreasonable because, *inter alia*, it may cause "administrative or financial hardship to the Union" or "discriminat[ion] against . . . other candidate[s]." *Id*. Because the District Court dismissed this case on the pleadings, the Union did not have the opportunity to present any *evidence* to satisfy its burden of proof as required by *Brown*.

Noble has pressed a straightforward complaint that obviously falls within the LMRDA's ambit. Noble is a bona fide candidate seeking to distribute campaign literature at his

own expense. And the Union does not dispute that it has declined to distribute Noble's campaign materials as he prefers. Noble's complaint plainly states a claim for relief that is plausible on its face and generally in line with other requests that courts have deemed reasonable under the LMRDA. *See, e.g.*, *Mims v. Teamsters Loc. No. 728*, 821 F.2d 1568, 1569, 1571 (11th Cir. 1987) (noting grant of preliminary injunction for candidate's request to distribute campaign literature to union membership at his expense); *Yablonski v. United Mine Workers of Am.*, 466 F.2d 424, 426, 431 (D.C. Cir. 1972) (same). And, as already noted, the Union has not presented any evidence to support its view that Noble's request is unreasonable. This is a matter that must be considered by the District Court in the first instance pursuant to summary judgment or after trial. *See*, *e.g.*, *Marshall v. Provision House Workers Union, Loc. 274*, 623 F.2d 1322, 1324-25 (9th Cir. 1980) (affirming summary judgment issued by the district court finding that a union rule regarding distribution of campaign literature was reasonable).

This is not to suggest that Noble has raised a meritorious claim under the LMRDA. That remains to be seen after the Union has had an opportunity to challenge the reasonableness of Noble's request. The statute requires only that unions "comply with all *reasonable* requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature." 29 U.S.C. § 481(c) (emphasis added). As the Supreme Court has articulated, "Section 401(c) simply prescribes a straightforward test: Is the candidate's distribution request reasonable?" *Brown*, 498 U.S. at 478. I agree with the majority opinion that "distribute" in section 401(c) of the LMRDA subsumes requests to post campaign material in a union newspaper. It does not follow, however, that every such request is "reasonable."

Summary judgment or trial will afford the Union an opportunity to demonstrate that Noble's request is unreasonable. Although, as mentioned above, a union member's request is not "*per se* unreasonable simply because it conflicts with a union rule," *id.*, the reasonableness of the Union rules at issue in this case obviously will weigh in the balance. If the Union's rules reasonably apply to Noble's request, then Noble's request may be unreasonable by virtue of the justifications underlying the Union's rules. None of these showings, however, can be made by the Union on a motion to dismiss, at least not on the record that thus far has been developed in this case.

Finally, because we leave open the issue of whether the Union must publish Noble's campaign literature pending a determination on the reasonableness of Noble's request, there is no good reason to reach the First Amendment issue raised by the Union. Furthermore, it is noteworthy that there is no First Amendment issue here emanating from competing messages from different speakers. Rather, in my view, the issue raised by the Union obliquely questions whether Congress may permissibly place restrictions on how a union orders its internal operations. However, the Supreme Court made it clear years ago that the regulatory reach of the LMRDA does not raise viable causes for concern under the First Amendment. *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 530-31 (1972) (LMRDA passed because "[h]aving conferred substantial power on labor organizations, Congress began to be concerned about the danger that union leaders would abuse that power, to the detriment of the rank-and-file members."); *Wirtz v. Loc. 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 471 (1968) (LMRDA represents congressionally struck balance of "how best to legislate against revealed abuses in union elections without departing needlessly from [Congress's] long-

standing policy against unnecessary governmental intrusion into internal union affairs.").

I agree that we must reverse and remand the case so that the District Court may properly consider, pursuant to summary judgment or trial, whether the Union has met its burden to show that Noble's request to seek distribution of his campaign materials through his Union's publication is unreasonable.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

Section 401(c) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) grants all candidates for union office the opportunity to disseminate their campaign materials to the union's members. One way it does so is by obliging the union "to comply with all reasonable requests of any candidate *to distribute by mail or otherwise* at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing." 29 U.S.C. § 481(c) (emphasis added). The majority concludes that section 401(c) encompasses a candidate's request to purchase advertising space in a union magazine in order to publish a campaign advertisement and it remands for further proceedings to determine whether such a request is "reasonable" under the circumstances.

But the duty imposed by section 401(c) is limited. Interpreted in context, section 401(c) only requires a union to send — or otherwise arrange for the delivery of — campaign materials a candidate provides it. Recognizing a right of publication — the affirmative right to compel union publications to open their pages to content they may not wish to carry — distorts the ordinary meaning of the union's duty "to distribute . . . campaign literature." Because I think Noble's request for publication falls outside the scope of section 401(c), I would affirm the district court's dismissal.

The National Association of Letter Carriers (NALC) elects its officers every four years. David Noble, a longtime member of the union and frequent candidate for office, ran for president in the October 2022 election. Ten months earlier, Noble emailed NALC about purchasing advertising space for his campaign ads in the *Postal Record*, the union's monthly magazine, beginning in February 2022. NALC declined, explaining that "[i]n accordance with longstanding NALC policy, NALC does not run political ads in the *Postal Record*,

with the exception of one issue every four years, preceding the NALC national officer elections. The rates and deadline for political ads for that issue have not yet been determined." JA24. Noble sued, arguing that LMRDA section 401(c) requires NALC to publish his advertisement.

The issue is whether Noble's request falls within the duty section 401(c) imposes on NALC. I believe it does not. As discussed below, the statute's text and legislative history confirm — at least, to me — that a duty to *distribute* is narrower — and therefore different — than a duty to *publish*.

## I.

Section 401(c) provides a procedure by which candidates for union office must go through the union to circulate their campaign materials because the union controls access to the union members' names and addresses. The statute imposes four duties on unions to ensure that all candidates have an equal opportunity to reach the voting audience. It provides that every union

> shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, [1] to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and [2] to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and [3] whenever such labor organizations or its officers authorize the

distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. [4] Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization.

29 U.S.C. § 481(c) (alterations added). Our focus is on the first duty. Does Noble's request to purchase advertising space in the *Postal Record* constitute a request "to distribute by mail or otherwise . . . campaign literature?"

The majority answers that question in the affirmative because it reads "distribute" as "synonymous" with "publish." Op. at 7. It reaches that conclusion not by simply examining section 401(c)'s text but by turning to our holding in *Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015). In *Cause of Action*, we dealt with a fee waiver provision of the Freedom of Information Act available to "representative[s] of the news media." 5 U.S.C. § 552(a)(4)(A)(ii)(II). An individual can qualify as a news media representative only if he "distributes [his] work to an audience." *Id.* § 552(a)(4)(A)(ii). It is in that specific context that we held that "posting content to a public website can qualify as a means of distributing it." *Cause of Action*, 799 F.3d at 1123. My colleagues now make two leaps from that statement, equating "posting content" with "publishing" and then "publishing" with "distributing." *See* Op. at 7 (*Cause of Action* "clarif[ies] that posting qualifies as

publishing."). But I believe *Cause of Action* sheds little light on the statute here for at least two reasons.

First, and most importantly, statutory meaning stems from its context and the *Cause of Action* context bears little resemblance to section 401(c)'s context. The majority assumes that "distribute" must mean the same in section 401(c) as it does in FOIA but the United States Supreme Court has frequently "give[n] a different reading to the same language" when it "appear[s] in separate statutes or in separate provisions of the same statute." *Smith v. City of Jackson*, 544 U.S. 228, 260–61 (2005) (O'Connor, J., concurring); *see, e.g.*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522–25 (1994) (interpreting "virtually identical language" differently in separate statutes); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) (rejecting the argument "that the word 'age' has the same meaning wherever the [Age Discrimination in Employment Act of 1967] uses it"). The majority does not explain how a FOIA fee waiver provision helps us understand section 401(c). And there is little reason to think that it does; unlike the FOIA provision at issue in *Cause of Action*, section 401(c) contains other terms that bear on the scope of "distribute." I submit the two statutes have material differences both in wording and subject matter that preclude treating them as interchangeable.[1]

Even assuming its relevance, *Cause of Action* does not mean that distribution is "synonymous" with publishing. It simply states that "posting content to a public website *can*

---

[1] The majority's reliance on *National Security Archive* is similarly misplaced because it addressed the same FOIA fee waiver provision. *See Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381, 1386 (D.C. Cir. 1989). Again, the majority does not explain why the meaning of section 401(c) flows from an unrelated and differently worded statute.

*qualify* as a means of distributing it." *Id.* at 1123 (emphasis added); *see also id.* ("Even with the recognition that online dissemination *can qualify* as a means of distribution…" (emphasis added)). All *Cause of Action* says is that online posting can sometimes amount to distributing information depending on the facts. That is a far cry from holding the terms to be equivalent. Moreover, the type of publishing at issue in *Cause of Action* — online posting — differs from the traditional print publication Noble's request involves.

A close examination of section 401(c)'s text shows that distribution does not encompass publication. In 1959, when the Congress enacted LMRDA, "distribute" meant what it does today: "to divide and bestow in shares; deal out; allot." *Distribute*, The American College Dictionary 353 (1958) ("DISTRIBUTE implies apportioned, individualized, and, often, personal giving, esp. of something that is definite or limited in amount or number"); *see also Distribute*, 1 Funk & Wagnall's Standard Dictionary of the English Language (International Edition) 371 (1960) ("To divide and deal out in shares; apportion; allot."); *Distribute*, Webster's New Twentieth Century Dictionary of the English Language 535 (2d ed. 1977) ("[I]n the postal service, to place (the various pieces of mail) in the proper receptacle."). Noble argues that publication qualifies as one type of distribution, *see* Appellant's Br. 23, and some dictionaries do connect the two concepts. *See Publish*, *Black's Law Dictionary* 1246 (7th ed. 2009) ("[T]o distribute copies (of a work) to the public.")[2] But our job is to give the statute its ordinary meaning, not necessarily the broadest literal reading a dictionary definition can support. *See Niz-Chavez v. Garland*,

---

[2] Other dictionaries, however, draw a distinction between distribution and publication. *See Publish*, The Online Oxford English Dictionary ("To *prepare and issue* copies of (a book, newspaper, piece of music, etc.) *for distribution* or sale to the public." (emphases added)).

593 U.S. 155, 168–69 (2021) ("[W]hen interpreting this or any statute, we do not aim for 'literal' interpretations…. We simply seek the law's ordinary meaning."). Statutory context cuts against the literalism that Noble urges and the majority adopts.

Critically, publication is a more involved process than what the statute's type of distribution envisions. Section 401(c) instructs the union to "distribute by mail or otherwise." In plain English, "distribute by mail" means "send by mail" so it follows that "or otherwise" means "send by means other than mail." *See United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023) ("otherwise" means "in another way" or "by other means"). Sending something is a one-step, almost ministerial process. Publication, by contrast, requires more. Consider what exactly Noble requested: He asked NALC to sell him advertising space in the *Postal Record*, thus requiring NALC to place and format his advertisement within the magazine, print the magazine and, only after these steps, send the magazine to the union's members. Here, publication is a multistep process, including deciding where to place the advertisement within the publication. Distribution does not go that far.[3]

---

[3] Additionally, the ordinary meaning of "campaign literature" (which statutory language the majority does not discuss) suggests that the union's duty to distribute applies only to standalone campaign materials, unlike Noble's advertisement. "Literature" connotes discrete printed materials such as pamphlets and circulars. *See Literature*, The American College Dictionary, *supra*, at 712 ("*Colloq.* printed matter of any kind, as circulars or advertising matter."); 1 Funk & Wagnall's, *supra*, at 744 ("Any printed matter used or distributed for advertising or political purposes, etc.: campaign *literature*."); Merriam-Webster Unabridged Dictionary (3d ed. 1961) ("[L]eaflets, handbills, circulars, or other printed matter of any kind."). I read "campaign literature" not in its literal

My interpretation does not render "or otherwise" in the statute superfluous, contrary to the majority's suggestion. *See* Op. at 7–8. That language authorizes the union to send or deliver campaign materials via means *other than* the mail. It might, for instance, encompass a request that the union hand out flyers to members leaving a jobsite. Or it might allow for technological change, such as distributing discrete campaign materials by email rather than mail. *See Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37, 49 (D.D.C. 2013) (section 401(c) includes distribution by email).

In sum, *how* section 401(c) commands the union to distribute campaign literature requires reading the statute to impose on the union the duty to deliver only. The obligation "to distribute by mail or otherwise . . . campaign literature" is not naturally read to embrace a duty to publish.

## II.

To the extent the statutory text is ambiguous, the legislative history supports my interpretation. *See Goldring v. D.C.*, 416 F.3d 70, 74 (D.C. Cir. 2005) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." (alteration and quotation omitted)). Section 401(c) was a congressional compromise that kept the names and addresses of the union's members private in return for the union circulating the candidate's campaign materials on his behalf. The legislative history shows that the Congress intended section 401(c) to require the union to provide for the delivery of campaign

---

sense of "[a]ny printed matter" but more specifically as printed matter that is discrete and not included in a larger work.

materials, thus allowing all candidates the benefit of the membership list.

Section 401(c) emerged as a compromise between dueling House and Senate proposals about how to ensure that all candidates could reach their constituents with their campaign materials. The Congress recognized that incumbent officers enjoyed an electoral advantage over their challengers by having access to a list of the union's members and their addresses. *See* U.S. Department of Labor, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959: Titles I–VI* (*LMRDA Titles I–VI*) 810 (1964); 2 National Labor Relations Board, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* (*LMRDA Legislative History*) 1240 (1959). The House proposed giving all candidates the "right to inspect and copy a list containing the names and last known addresses" of the union's members so that challengers and incumbents alike could reach the membership directly. House Rep. 86-741, at 41 (1959).

The Senate, however, feared that a right to copy the list could be abused. As then-Senator John F. Kennedy warned, such a right would "create[] grave danger that stooges would obtain the membership lists for subversive organizations or commercial use." *LMRDA Titles I–VI*, *supra*, at 833; *see also* 2 *LMRDA Legislative History*, *supra*, at 1240 (Senator John McClellan explaining that "there was apprehension that a person might become a candidate and then might use the list for improper purposes"). Some House members similarly argued that a right to copy the list would "provide[] protection for the pro forma candidate for office who is really a company spy or a Communist agent, pretending to union candidacy for the sole purpose of obtaining membership lists for nefarious purposes." House Rep. 86-741, at 86 (1959) (Supplementary views of Reps. Powell, Bailey, Weir, Roosevelt, Zelenko,

Holland, Dent and Pucinski). The Senate proposed an amendment that included the right to campaign literature distribution that ultimately made its way into section 401(c) but it did not provide for direct access to the membership list or to the members' addresses. *LMRDA Titles I–VI*, *supra*, at 833; *id.* at 834.

A conference committee proposed keeping the Senate's distribution right unchanged and supplementing it with the one-time right to inspect, but not copy, the list within thirty days of the election. 1 *LMRDA Legislative History*, *supra*, at 938, 957. Senator Kennedy supported the right of inspection "as a way of checking the accuracy of the union's mailing list, for the candidate will thus be able to ascertain whether the union has in fact mailed his campaign literature to those he knows to be union members." *LMRDA Titles I–VI*, *supra*, at 833. Rejecting the central feature of the House proposal, the Congress decided that the union, not the candidates, would distribute campaign material. It crafted section 401(c) to keep the membership list in union hands while effectively giving challengers the same access to the list that incumbents had.[4]

---

[4] The distribution debate manifests that the Congress expected that the union would simply mail or otherwise send campaign materials the candidate provided. One Senator explained that the provision "would simply permit [a candidate] to send his campaign materials to the union and have the union mail it out." *Id.* at 800 (statement of Senator John McClellan). Another Senator, introducing the amendment that became section 401(c), said that it "require[d] the union to send [a candidate's] political pamphleteering to the members of the union." *Id.* at 798 (statement of Senator Thomas Kuchel). Yet another stated that it "guarantees to every candidate the use of union mailing lists and distribution machinery." *Id.* at 805 (statement of Senator Wayne Morse). And Senator Kennedy, speaking after the conference committee had reached its compromise, stated that section 401(c) "provided that mailings must

The legislative history manifests that there is no mismatch between the text and the Congress's intent. It wanted to level the playing field between incumbents and challengers without giving challengers direct access to the list. The solution was to require the union to make use of the list on behalf of any candidate who requested it to do so. My colleagues' interpretation, I believe, departs therefrom by extending the union's duty beyond making use of the list on the challenger's behalf.[5]

be made by the union" and "required a union to mail out all members campaign literature submitted by candidates." *Id.* at 831, 833. What these statements have in common is the understanding that the union had to give all candidates the benefit of the union's mailing list. No one suggested the union's duty extended further, and for good reason: the point of the provision was to neutralize the advantage incumbents enjoyed by having access to the list.

Several Senators read "campaign literature" to refer to standalone materials like circulars and pamphlets. New York Senator Jacob Javits, the amendment's author, noted that the amendment referred to the "use of mailings or circulars." *Id.* at 799. Another summarized the amendment as dealing with "political pamphleteering." *Id.* at 798. And Senator Barry Goldwater, who preferred giving candidates direct access to the list, predicted that "[g]iven the hoodlum control of some unions, it is more than likely that the campaign literature of the rival candidate will find its way into the sewer or the incinerator." *Id.* at 811. He apparently anticipated candidates would submit standalone materials for delivery — the type that could go missing.

[5] My colleagues note that I raise an issue not discussed by the parties, *see* Op. at 9, but they misunderstand my point. My argument is not that Noble's request "runs the risk of a union losing control over its membership list," *see id.*, but that the legislative history confirms that a union's duty extends only to using its membership list on behalf of candidates. Noble's request for publication goes beyond that duty and therefore falls outside section 401(c), whose

In my view, the district court properly dismissed Noble's claim. Accordingly, I respectfully dissent.

---

meaning is *the* issue. And, even if the parties had not raised the issue, we have an independent duty to "say what the law is" when interpreting a statute. *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). "[T]he court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993); *see also Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013).